COMMONWEALTH of Pennsylvania,
Appellee

v.

Thomas John MOORE, Appellant.

Superior Court of Pennsylvania.

Argued Feb. 24, 2009.

Filed Aug. 27, 2009.

Thomas N. Farrell, Pittsburgh, for appellant.

Michael W. Streily, Deputy Dist. Atty., Pittsburgh, and Margaret B. Ivory, Asst. Dist. Atty., Pittsburgh, for Commonwealth, appellee.

BEFORE: MUSMANNO, SHOGAN and COLVILLE *, JJ.

OPINION BY MUSMANNO, J.:

¶ 1 Thomas John Moore ("Moore") appeals from the judgment of sentence imposed following his convictions of two counts of accidents involving death or personal injury. *See* 75 Pa.C.S.A. § 3742(a). We affirm.

¶ 2 On December 11, 2005, Shawna Linsenbigler ("Linsenbigler"), age 10, James Zeitlman ("Zeitlman"), age 13, and Brittany Raymond ("Raymond"), age 12, were sledding down a hill in Turtle Creek. The hill, which was located next to Linsenbigler and Zeitlman's grandmother's home, had two bumps on it and ended at Negley Avenue. At approximately 2:21 p.m., the three children were sledding down the hill on one sled with Linsenbigler in front, Raymond in the middle and Zeitlman in the rear. When they traversed the first bump on the hill, Zeitlman fell off the sled. The two girls remained on the sled, which then entered Negley Avenue and was struck by a gray pickup truck. Zeitlman saw the back end of the truck lift up and Linsenbigler and Raymond roll out from underneath the truck. Zeitlman ran to the

bottom of the hill and yelled for the truck to stop. The truck slowed down and then sped away and left the scene. Zeitlman called for help and returned to the scene where Linsenbigler and Raymond were lying on the roadway bleeding. Raymond suffered a broken pelvis, a large cut over her eye, a large gash in her head, which required staples, road burn on her stomach and a cut to her elbow. Linsenbigler died on December 26, 2005, as a result of the injuries she suffered.

¶ 3 Zeitlman described the truck to the police and indicated that the truck belonged to "Skeeter," which was Moore's nickname. Police officers were told to be on the lookout for the gray pickup truck. That same day, the officers found Moore's truck, which matched the description given by Zeitlman. The officers then took Zeitlman to the truck, which he identified as being involved in the incident. The officers asked Moore to accompany them to the Turtle Creek Police Station. Once there, the officers read Moore his rights and proceeded to question him about the incident. Moore stated that he had been at Caesar Bar to watch the Pittsburgh Steelers game but had driven home sometime prior to the second quarter starting. Moore stated that after he got home, he smoked a bowl of marijuana and drank several beers. The officers requested that Moore submit a blood and urine sample. Moore had blood drawn and his blood alcohol content was determined to be .101%.

¶ 4 Moore was subsequently arrested and charged with one count each of homicide by vehicle while driving under the influence, homicide by vehicle, involuntary manslaughter, aggravated assault by a vehicle while driving under the influence, and reckless driving; two counts of accidents involving death or personal injury

* Retired Senior Judge assigned to the Superior Court.

and four counts of driving under the influence. The trial court held a preliminary hearing on February 17, 2006, at which Zeitlman and Raymond testified. The charges were bound over for trial. On September 9, 2006, Moore filed an omnibus pre-trial Motion which argued, *inter alia*, that a competency hearing should be held for Zeitlman and Raymond pursuant to Pennsylvania Rule of Evidence 601. Moore filed a supplemental pre-trial Motion on September 26, 2006. The Commonwealth filed a response on January 3, 2007. Subsequently, on January 23, 2007, the Commonwealth filed a Petition to *nolle prosse* the single counts of homicide by vehicle while driving under the influence and aggravated assault by vehicle while driving under the influence and the four counts of driving under the influence. The trial court granted this Petition.

¶ 5 A hearing on Moore's pre-trial Motions was held on June 18, 2007, before the Honorable Kathleen Durkin. On July 6, 2007, Judge Durkin denied the pre-trial Motions. Moore then proceeded to a jury trial before the Honorable John K. Reilly on July 10, 2007. Zeitlman (age 14 at the time of trial) and Raymond (age 13 at the time of trial) both testified at trial. After hearing all of the evidence, the jury found Moore guilty of two counts of accidents involving death or personal injury and not guilty of homicide by vehicle. The jury was hung as to the charge of involuntary manslaughter. Moore was later found not guilty of the summary offense of reckless driving. Moore filed a Motion to dismiss the involuntary manslaughter charge. Thereafter, the Commonwealth presented a Motion to *nolle prosse* the involuntary manslaughter charge and the trial court granted the Motion.

¶ 6 On October 1, 2007, Judge Reilly sentenced Moore to an aggregate prison term of two to six years. On October 4, 2007, Moore filed a post-sentence Motion, arguing, *inter alia*, that the trial court erred in refusing to conduct a competency hearing. The trial court denied the Motion on January 10, 2008. Moore filed a timely Notice of appeal. The trial court ordered Moore to file a Pennsylvania Rule of Appellate Procedure 1925(b) concise statement. Moore filed a timely Concise Statement; however, the trial court did not issue an Opinion.

¶ 7 On appeal, Moore raises the following question for our review: "Whether the pre-trial court erred in refusing to conduct a hearing as to the competency of the two child witnesses?" Brief for Appellant at 4.

¶ 8 Moore contends that the trial court should have held competency hearings for the children prior to trial. *Id.* at 41. Moore argues that a competency hearing should have been conducted to determine whether the child witnesses were tainted. *Id.* at 47–48, 52–57. Moore relies upon *Commonwealth v. Delbridge*, 578 Pa. 641, 855 A.2d 27 (2003), to support his argument. Brief for Appellant at 45–47.

¶ 9 The Commonwealth argues that *Delbridge* is inapplicable because that case involved the influence of authority figures over young children who made allegations of sexual abuse. Brief for the Commonwealth at 13–14. The Commonwealth alternatively argues that even if the principles of *Delbridge* apply in this case, Moore was not entitled to a competency/taint hearing because he did not provide any evidence of taint. Brief for the Commonwealth at 15–16.

■ ¶ 10 "In Pennsylvania, the general rule is that every witness is presumed to be competent to be a witness." *Commonwealth v. Judd*, 897 A.2d 1224, 1228 (Pa.Super.2006); *see also* Pa.R.E. 601(a). Despite the general presumption of competency, Pennsylvania specifically requires

an examination of child witnesses for competency. *See* Pa.R.E. 601(b); *Commonwealth v. Washington*, 554 Pa. 559, 722 A.2d 643, 646 (1998) (stating that "[a] child's competency to testify is a threshold legal issue that the trial court must decide, and an appellate court will not disturb its determination absent an abuse of discretion."). The Supreme Court of Pennsylvania established that when a witness is under the age of fourteen, the trial court must hold a competency hearing. *See Rosche v. McCoy*, 397 Pa. 615, 156 A.2d 307, 310 (1959) (holding that "competency is presumed where the child is more than 14 years of age. Under 14 there must be a judicial inquiry as to mental capacity, which must be more searching in proportion to chronological immaturity."). The *Rosche* Court instructed that the following factors must be applied in determining competency:

> There must be (1) such capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering what it is that [the child] is called to testify about and (3) a consciousness of the duty to speak the truth.

*Id.; see also Commonwealth v. Hunzer*, 868 A.2d 498, 507–08 (Pa.Super.2005) (concluding that pre-trial competency hearing for child witness to crime was proper).

¶ 11 In *Delbridge*, the Supreme Court of Pennsylvania expanded the competency hearing to include a determination of whether a child victim's testimony was tainted by the inquiries of adults. *Delbridge*, 855 A.2d at 39–40. In making this determination, the Court stated the following regarding the issue of taint:

> The core belief underlying the theory of taint is that a child's memory is peculiarly susceptible to suggestibility so that when called to testify a child may have difficulty distinguishing fact from fantasy. Taint is the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of the child, rendering that child incompetent to testify.

*Id.* at 34–35 (internal citations omitted). The Court also explained the effect of taint on the testimonial capacity of immature witnesses:

> The capacity of young children to testify has always been a concern as their immaturity can impact their ability to meet the minimal legal requirements of competency. Common experience informs us that children are, by their very essence, fanciful creatures who have difficulty distinguishing fantasy from reality; who when asked a question want to give the "right" answer, the answer that pleases the interrogator; who are subject to repeat ideas placed in their heads by others; and who have limited capacity for accurate memory.
>
> A competency hearing concerns itself with the minimal capacity of the witness to communicate, to observe an event and accurately recall that observation, and to understand the necessity to speak the truth. A competency hearing is not concerned with credibility. Credibility involves an assessment of whether or not what the witness says is true; this is a question for the fact finder. An allegation that the witness's memory of the event has been tainted raises a red flag regarding competency, not credibility. Where it can be demonstrated that a witness's memory has been affected so that their recall of events may not be dependable, Pennsylvania law charges

the trial court with the responsibility to investigate the legitimacy of such an allegation.

*Id.* at 39–40 (internal citations omitted). The Supreme Court accordingly concluded that an allegation of taint centers on the second element of the competency test and that the "appropriate venue" for investigation into a taint claim is a competency hearing. *Id.* at 40 (holding that a competency hearing is centered on the inquiry into "the minimal capacity of the witness to communicate, to observe an event and accurately recall that observation, and to understand the necessity to speak the truth.").

¶ 12 As noted above, the Commonwealth argues that the reasoning of *Delbridge* does not apply in this case. We acknowledge that the Supreme Court's holding in *Delbridge* spoke to the issue of taint in cases involving sexual abuse complaints made by young children.[1] *See id.* at 39 (holding "that taint is a legitimate question for examination in cases involving complaints of sexual abuse made by young children."); *id.* at 30 (stating that "[t]his appeal raises the question of whether 'taint,' that is, the implantation of false memories or distortion of actual memories through improper and suggestive interview techniques, is a subject properly explored during a hearing testing the **competency of a child witness in sexual abuse cases.**") (emphasis added); *see also Commonwealth v. Delbridge,* 580 Pa. 68, 859 A.2d 1254, 1259 (2004) (*"Delbridge II"*) (stating that in the "narrow group of cases, involving allegations of sexual abuse inflicted upon children of tender years, the existence of taint is a threshold question to determining competency."). However, the Supreme Court also utilized language indi-

cating that the new procedure for taint hearings was applicable to all child witnesses. *See Delbridge,* 855 A.2d at 34 (stating that "[t]his court granted allocatur primarily to consider whether taint is a legitimate avenue of exploration regarding the competency of a child witness. The grant of allocatur extended to related questions raised by Appellant within the context of the competency hearing itself and the rulings on the admissibility of the hearsay statements of the child witnesses."). While the facts of *Delbridge* and its progeny involved victims of sexual abuse, nothing in the *Delbridge* decision explicitly limited its holding to sexual abuse cases. *Cf. Commonwealth v. Iafrate,* 527 Pa. 497, 594 A.2d 293, 295 (1991) (holding that its decision "is limited to a determination of age under our Juvenile Act.").

¶ 13 Further, there is no indication that the *Delbridge* Court limited its holding to young children. Indeed, the *Delbridge* Court specifically stated that the taint process would be made a part of the competency hearing process. It is well-settled that a competency hearing should be held for children under the age of fourteen and that no arbitrary split within this age group has been propagated by any courts. *See Judd,* 897 A.2d at 1229 (stating that competency concerns "become less relevant as a witness's age increases, ultimately being rendered totally irrelevant as a matter of law by age fourteen."). Accordingly, we disagree with the Commonwealth's argument and conclude that the Supreme Court did not limit its holding in *Delbridge* to those instances involving a young child victim of sexual abuse.

---

1. The Commonwealth points out that cases analyzed by the *Delbridge* Court, and subsequent cases interpreting *Delbridge,* have all been sexual assault cases. *See* Brief for the Commonwealth at 13.

■ ¶ 14 After determining that a competency hearing was the proper forum for inquiry into the subject of taint, the *Delbridge* Court discussed the burden of production necessary to trigger a hearing, and the burden of persuasion necessary to sustain the challenge:

> In order to trigger an investigation of competency on the issue of taint, the moving party must show some evidence of taint. Once some evidence of taint is presented, the competency hearing must be expanded to explore this specific question. During the hearing the party alleging taint bears the burden of production of evidence of taint and the burden of persuasion to show taint by clear and convincing evidence. Pennsylvania has always maintained that since competency is the presumption, the moving party must carry the burden of overcoming that presumption .... [A]s with all questions of competency, the resolution of a taint challenge to the competency of a child witness is a matter addressed to the discretion of the trial court.

*Id.* at 40–41 (internal citations omitted).[2] "When determining whether a defendant has presented 'some evidence' of taint, the court must consider the totality of the circumstances surrounding the child's allegations." *Judd*, 897 A.2d at 1229. Some of the factors that courts have deemed relevant in this analysis include the age of the child, whether the child has been subject to repeated interviews by adults in positions of authority, and the existence of independent evidence regarding the interview techniques utilized. *Delbridge*, 855 A.2d at 41; *see also Judd*, 897 A.2d at 1229.

■ ¶ 15 Here, Zeitlman was fourteen years old at the time of trial and therefore did not require a competency hearing. Any issues regarding Zeitlman's observation of the incident is a question of credibility and does not implicate taint. *See Judd*, 897 A.2d at 1229 (stating that a competency hearing is not needed for a girl who is fifteen years old at the time of trial because her "ability to correctly remember the events in question is properly a question of credibility, and not of taint.").[3]

¶ 16 In any event, Moore did not demonstrate that Zeitlman was either incompetent or that his testimony was tainted. Indeed, Zeitlman identified the truck right after the incident, and the police subsequently located the vehicle. N.T., 7/10/07, at 38–39, 51–52. Zeitlman testified that the police initially took him to see a truck which Zeitlman indicated was too small before they took him to Moore's truck which Zeitlman identified as the truck

---

2. Based upon the facts of that case, the *Delbridge* Court remanded the case to the trial court for a taint hearing and retained jurisdiction. *Delbridge*, 855 A.2d at 47. The trial court held a new competency hearing and concluded that Delbridge had failed to meet his burden in proving taint. *Delbridge II*, 859 A.2d at 1257. The Supreme Court upheld the trial court's decision. *Id.* at 1259.

3. Moore argues that the language of Evidence Rule 601(b)(1) requires a court to determine a child's ability to perceive accurately both at the time of the competency hearing and at any other relevant time including the time during which events the child is describing occurred. Brief for Appellant at 44–45, 58. However, Moore acknowledges that the *Judd* decision would preclude a competency hearing for fourteen-year-old Zeitlman. Brief for Appellant at 58. Moore states that he raised this issue on direct appeal to ensure that it is preserved for potential *en banc* review or Supreme Court review. *Id.* Because our Supreme Court has not addressed the issue of whether a competency and taint hearing should be held where the child is under the age of fourteen at the time of the incident but over the age of fourteen at the time of trial, we rely on *Judd* to deny Moore's claim.

used in the incident. *Id.* at 38–39. Further, while Zeitlman stated that he identified the truck, he admitted that he could not identify the driver. Zeitlman indicated that no one had told or suggested to him that Moore was responsible. *Id.* at 59. Based upon the record, Zeitlman's recollection of the incident was his own and was not suggested by any other person. Moore's claims citing to inaccuracies in Zeitlman's testimony do not in themselves demonstrate that Zeitlman's testimony was incompetent or tainted in this case. Accordingly, Moore's claim as to Zeitlman is without merit.

■ ¶ 17 Raymond, however, was only thirteen years old when she testified at trial. N.T., 7/10/07, at 65. Accordingly, the trial court should have held a competency hearing outside of the presence of the jury. *See Rosche,* 156 A.2d at 310. However, we must determine whether the competency hearing should have been expanded to include evidence of taint. Raymond testified to the following, in pertinent part:

Q: What kind of vehicle did [Moore] drive?

A: It was a gray truck.

Q: Prior to December of 2005, had you ever seen [Moore] in that truck?

A: Yes.

Q: How did you know it was [Moore's] truck?

A: We had seen him in it before.

Q: Anything about that truck that made it different from all the other trucks?

A: There was rust on the side of it.

N.T., 7/10/07, at 68. Raymond then described what happened just prior to and during the incident:

Q: So you and Shawna continue down the hill?

A: Yes.

Q: What happens?

A: There was a gray truck going by.

Q: Tell us what happened.

A: Then I saw the side of it, the left side of the truck, and then after that, I closed my eyes and then I opened them back up and I was under the truck.

Q: What did you see when you were under the truck?

A: There was *[sic]* rusty pipes under it.

*Id.* at 71–72. Raymond then testified to the following:

Q: Up until the date of the preliminary hearing [on February 17, 2006,] had you ever spoken to the police?

A: No.

Q: Had you ever met [the prosecutor] before?

A: No.

Q: Or Detective [Robert] Keenan?

A: No.

Q: So nobody came to question you about what happened, right?

A: No.

Q: You were home getting better?

A: Yes.

Q: [Zeitlman] came to visit you, right?

A: Yes.

Q: Did you talk about the accident?

A: No.

Q: Do you know whose truck it was that hit you?

A: Yes.

Q: Whose truck was it?

A: [Moore's]

. . . .

Q: How did you know it was [Moore's] truck?

A: Because I knew. I walked to school and I went by his truck and I saw it

before that. That was the same rust that I had saw *[sic]* when I got ran over.

Q: You had seen the truck before?

A: Yes.

Q: Did you see who was driving the truck?

A: No.

Q: Did [Zeitlman] ever tell you who was driving the truck

A: No.

Q: Did [Zeitlman] ever tell you whose truck he thought it was?

A: Yes.

Q: When was that?

A: It was after the first trial that we had.

Q: You mean the preliminary hearing?

A: Yes.

Q: You were in the room when [Zeitlman] testified at the preliminary hearing, right?

A: Yes.

Q: Did you decide to say it was [Moore's] truck because [Zeitlman] said it was [Moore's] truck?

A: No.

Q: Did your mom or your dad or your stepdad ever tell you what to say?

A: No.

Q: Anybody else?

A: No.

Q: And the first time you ever said that you recognized the truck was the day of the preliminary hearing?

A: Yes.

Q: Was that the first time you had ever talked about the details of what happened?

A: Yes.

*Id.* at 75–77. Raymond testified to the following on cross-examination:

Q: You knew [Moore's] truck?

A: Yes.

Q: You walked past his truck all the time?

A: Yes

. . . .

Q: You would agree with me that there is nothing unusual about [Moore's] truck, is that right?

A: No.

Q: In fact, you testified you think there is something unusual?

A: Yes.

Q: What would that be?

A: The rust on it.

Q: ... The truck that hit you, was there anything unusual about that truck?

A: No.

Q: So you didn't see anything unusual about the truck that hit you, is that correct?

A: Correct.

Q: But [Moore's] truck had something very unusual and he has that rust mark?

A: Yes.

Q: It's fair to say that you didn't see the rust mark before you got hit, is that correct?

A: No.

. . .

Q: What did you testify ... at the preliminary hearing as to the truck?

A: That there was nothing unusual.

Q: Nothing unusual on that truck. And this was a couple months after the accident, is that right?

A: Yes.

. . .

Q: You were going down the hill real quick?

A: Yes.

Q: You are focusing on that, is that correct?

A: Yes.

Q: Right about close to the road, you saw the vehicle, is that correct?

A: No, I saw it in front of us.

Q: You saw it in front of you?

A: Yes

. . . .

Q: Did you see the side of the truck, the front of the truck?

A: The side.

Q: The side of the truck?

A: Yes.

Q: So this truck had already gone past you?

A: No it was in front of me.

Q: Right in front of you?

A: Yes.

Q: You would agree with me that the left rear—I'm sorry, the left front tire, the front tires were already past you, is that correct?

A: Yes.

Q: You were looking between the two tires?

A: Yes

. . . .

Q: ... If you recall, did you hit the side of the truck or did you slide under the truck?

A: I don't recall.

Q: You do recall that you were under the truck, is that correct?

A: Yes.

. . .

Q: You couldn't see the driver, is that right, since you were behind it?

A: Yes.

Q: And you don't know if the driver could see you guys?

A: Yes.

Q: You indicated that you talked to people. Did you talk to anyone at the scene?

A: Yes.

Q: Did you tell anyone what happened at the scene?

A: No.

Q: You didn't say, hey, that's [Moore's] truck at that point, correct?

A: Correct.

Q: You only learned that later, is that correct?

A: Yes. .

Q: You learned that from talking to everybody, right?

A: No.

Q: When did you first learn that it was [Moore's] truck?

A: After I was going from school and coming back home, and before I got hit by it.

Q: When did you first learn that that truck was [Moore's] truck?

A: I learned it after I was able to go into school.

. . .

Q: Would it be fair to say right after January you learned it was [Moore's] truck?

A: Yes.

Q: You went to school, correct?

A: Yes.

Q: And everybody said, hey, what happened to you, are you okay, is that correct?

A: Yes.

Q: You felt bad, is that right?

A: Yes.

Q: You blamed yourself?

A: Yes.

Q: Everybody told you [that] you shouldn't blame yourself, is that right?

A: Right.

Q: You should blame [Moore], is that correct?

A: No.

Q: People didn't tell you that it was [Moore] that did this?

A: No, nobody told me it was [Moore].

Q: Did you read about it in the newspaper?

A: No.

Q: Did your mom talk to you about it?

A: No.

Q: Family ever talk about it?

A: No.

Q: And nobody asked you?

A: No.

Q: Nobody asked you questions at all?

A: People asked me, but I said I wanted to keep it secret.

Q: People wouldn't talk about it in Turtle Creek?

A: Yeah, they would.

Q: What would they say?

A: They would ask who did it, why.

Q: But you didn't want to say anything?

A: Correct.

Q: Did they ever voice their own opinion of who they thought did it?

A: No.

Q: So for two and-a-half months, you didn't tell anyone?

A: Correct.

Q: When you went to the preliminary hearing, you were told that you had to testify, is that right?

A: Yes.

Q: What were you going to testify about?

A: I don't remember.

Q: Did anyone tell you what you were supposed to testify about?

A: Just of what happened.

Q: You sat through the testimony of [Zeitlman], isn't that correct, [Zeitlman's] testimony at the preliminary?

A: Yes.

Q: You were there?

A: Yes.

Q: You heard it?

A: Yes.

Q: You heard him testify that he though it might have been [Moore's] truck?

A: Yes.

Q: Then you testified next, is that correct?

A: Yes.

Q: You said it was [Moore's] truck?

A: Yes.

Q: That was the first time you ever told them?

A: Yes.

Q: You didn't tell the Assistant District Attorney, Lisa Pellegrini, right before the hearing, is that correct?

A: Correct.

Q: You knew that the preliminary hearing had to do with [ ] Moore, is that correct[?]

A: Yes.

*Id.* at 78, 81–82, 85–87, 88–92. On redirect examination, Raymond further testified to the following:

Q: You told the jury that you realized after you went back to school whose truck it was?

A: Yes.

Q: Did you catch a bus to go to school?

A: Yes.

Q: Where was the bus stop?

A: It was about three hills down from my house.

Q: Where did [Moore] live?

A: He lived down the hill from my house.

Q: Where was the bus stop in relation to [Moore's] house?

A: It was down one hill.

Q: When you would go back and forth to the bus stop, did you pass [Moore's] house?

A: Yes.

Q: What did you see in front of [Moore's] house?

A: There was a gray truck.

Q: Is that when you realized it was the truck?

A: Yes.

Q: But did you tell anyone?

A: No.

*Id.* at 94–95. On re-cross examination, Raymond testified as follows:

Q: And then after walking past [Moore's] truck multiple times, you realized it was [Moore's] truck that hit you?

A: Yes.

Q: Did you realize that he had been arrested for running over you?

A: Yes.

Q: So you knew he had been arrested by that time?

A: Yes.

*Id.* at 96.

¶ 18 Moore argues that he has presented "some evidence" of taint and that it should have been examined during a competency hearing because (1) Raymond was never interviewed by the police or the prosecution prior to the preliminary hearing to determine what Raymond had seen, (2) Raymond heard Zeitlman's testimony regarding Moore prior to testifying about

her recollection of the incident, (3) Raymond did not see anything at the incident as she saw only the back of the truck as she slid below it and did not see the driver, (4) Raymond had heard about the incident through people at her school, (5) Raymond knew the preliminary hearing involved Moore, and (6) there was a lot of publicity surrounding the incident. *See* Brief for Appellant at 52–57. The Commonwealth counters that Moore's assertions of taint are vague and unsubstantiated statements that influenced Raymond to state that Moore was the driver of the truck. Brief for the Commonwealth at 16–17, 21. The Commonwealth asserts that Raymond's recollection of the incident was independent and her own. *Id.* at 19. The Commonwealth argues that Raymond's testimony indicated that she observed the incident accurately and that any alleged flaw in her observations would go to her credibility and not her competency to testify. *Id.* at 21–22.

¶ 19 Initially, we note that a review of Raymond's testimony indicates that she had the capacity to communicate, including the ability to understand questions and express intelligent answers, and the ability to speak truthfully.[4] *See N.T.*, 2/17/06, at 17–18 (indicating that Raymond knew the difference between telling the truth and telling a lie); *see also Commonwealth v. Harvey*, 571 Pa. 533, 812 A.2d 1190, 1199 (2002) (concluding that while the trial court should have held a competency hearing for a thirteen-year-old child witness to a shooting, the record demonstrated that the child was able to understand the questions presented and was able to formulate intelligent answers and therefore the defendant was not prejudiced). Raymond also had the mental capacity to observe the incident

---

**4.** We note that Moore, in his appellate brief, does not dispute that Raymond had the capacity to communicate and express intelligent

answers or that she understood that she had the duty to speak the truth.

and recall the matter for which she was called to testify and her testimony was not tainted. *See Commonwealth v. D.J.A.,* 800 A.2d 965, 971–72 (Pa.Super.2002) (*en banc* ) (concluding that after reviewing the record, the child victim was capable of perceiving accurately what had occurred during the incident in question).

¶ 20 Indeed, Moore did not present any testimony or evidence that Raymond was influenced by interested adults or by suggestive, repetitive or coercive interview techniques by police officers. *See Delbridge,* 855 A.2d at 35 (defining taint as "the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement ... and other interested adults that are so unduly suggestive and coercive as to infect the memory of the child."). Raymond repeatedly testified that she had an independent recollection of the incident and the subsequent identification of Moore as the culprit. In this specific case, neither the police nor the prosecution interviewed Raymond prior to the preliminary hearing. Moreover, Raymond indicated that she was not influenced by the alleged vilification of the accused by fellow students and the media, her prior knowledge that Moore was on trial, or the fact that she heard Zeitlman identify Moore as the culprit at the preliminary hearing.[5] Finally, Raymond's memories as to her vantage point of the truck prior to being run over, the exact description of the truck and her identification of Moore after-the-fact does not, in and of itself, demonstrate that Raymond's testimony was unduly tainted by other persons or by the publicity surrounding the incident. Accordingly, we conclude that Moore's evidence does not rise to the level of that found in *Delbridge,*

as there was no authority figure forcing Raymond to testify in a certain manner and Raymond herself stated that she had an independent recollection of the events and that no one had talked to her or told her who had committed the act. *See Commonwealth v. Cesar,* 911 A.2d 978, 985–86 (Pa.Super.2006) (stating that appellant did not present evidence of taint as witness continually stated that she remembered the critical events independently). In conclusion, while a competency hearing as to Raymond should have been held, there was no evidence in the record that would demonstrate that Raymond was incompetent or tainted. Therefore, Moore was not prejudiced and remanding for a competency hearing would be a futile act. As a result, Moore's claim as to Raymond fails.

¶ 21 Judgment of sentence affirmed.

¶ 22 COLVILLE, J., files a Dissenting Opinion.

DISSENTING OPINION BY COLVILLE, J.:

¶ 1 Oral argument on Appellant's pretrial motion for a taint hearing concerning the two child witnesses was held before the Honorable Kathleen Durkin. Judge Durkin took the matter under advisement and later denied the motion. However, she did not write an opinion on her decision. I would remand for the preparation of an opinion by Judge Durkin because I believe the absence of that opinion hampers our review of the propriety of denying the pretrial motion. Accordingly, I dissent from the Majority's affirmance of the judgment of sentence.

---

**5.** Moore's counsel never requested that Raymond be sequestered during Zeitlman's testi-   mony at the preliminary hearing.