J-S45019-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KEVIN LEE BEAM | |
| Appellant | No. 1455 MDA 2014 |

Appeal from the PCRA Order of July 29, 2014
In the Court of Common Pleas of Franklin County
Criminal Division at No.: CP-28-CR-0000499-2009

BEFORE: BOWES, J., WECHT, J., and FITZGERALD, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED JULY 28, 2015**

Kevin Beam appeals the July 29, 2014 order dismissing his petition for relief pursuant to the Post Conviction Relief Act ("PCRA") , 42 Pa.C.S. §§ 9541-46. The PCRA court has comprehensively reviewed each of Beam's issues in two separate opinions, and has correctly concluded that Beam is not entitled to PCRA relief. Except for two minor issues, we adopt the PCRA court's opinions as our own, and we affirm.

Beam was convicted by a jury of rape, criminal attempt to commit involuntary deviate sexual intercourse, aggravated indecent assault, indecent assault, and endangering the welfare of a child.[1] In an opinion

---

[*]     Former Justice specially assigned to the Superior Court.

[1]     18 Pa.C.S. §§ 3121(a)(2), 901(a)—3123(a)(7), 3125(a)(1), 3126(a)(8), and 4304(a)(1), respectively.

prepared for purposes of Beam's direct appeal, the trial court summarized

the facts underlying Beam's convictions as follows:

> On March 18, 2009, Valerie D., M.D., and [Beam] went to the Pennsylvania State Police Barracks in Chambersburg[, Pennsylvania] to report that M.D. had been raped. M.D. was 14 years[-]old at the time, and she was pregnant. Valerie D. is her natural mother. Beam was Valerie D.'s [boyfriend], and at the time, he was about 35 years[-]old. Though Valerie D. and Beam were never married, they had been in a long-term relationship, and M.D. referred to Beam as "dad" "most of the time."

> The day before, Valerie D. discovered that M.D. appeared to be pregnant. She went to K-Mart to get a pregnancy test for M.D., which came back positive. On the way to the store, Beam called Valerie D. and said that he had "something to tell [her]." When she returned home, Beam told Valerie D. that he and M.D. had been hunting in the woods a few months ago. M.D. got cold, so Beam took her back to their car, a Chevy Blazer. At some point, M.D. got out of the Blazer to go to the bathroom, when two unidentified, unknown individuals attacked and seized her. One held her down, and the other raped her. When Valerie D. asked why Beam had not told anyone about the story, he said that M.D. did not want her mother to know about the incident.

> Unsurprisingly, the hunting story was a complete fabrication, invented by Beam to hide his own culpability. According to M.D., he made up the story on the night of March 17, 2009. On the way to the state police barracks, the three stopped at a gas station to get gas. While Valerie D. was inside the convenience store, Beam told M.D. to stick to his story. While being interviewed, M.D. told police the same story that Beam had told Valerie D. the night before: that a stranger had violated her during a hunting trip. She gave Trooper Courtney Pattillo, a criminal investigator, a written statement to that effect.

> During the interview, M.D. was having a hard time answering questions, so Trooper Pattillo had Beam, then Valerie D., leave the interview room. Troopers G. David Peck and Jason Cachara interviewed Beam separately at the behest of Trooper Pattillo. [Trooper Pattillo] had an overall feeling that some things about the hunting story were not making sense.

Troopers Peck and Cachara first began to interview Beam as an eyewitness, or more properly, the first person to see M.D. after the alleged hunting-trip rape. According to Trooper Peck, Beam answered questions slowly and with his head down. The troopers were incredulous that Beam had told no one of the strangers' alleged rape of M.D. for over three months, but they were unsuccessful in finding out why he failed to disclose the story. Eventually, Trooper Peck asked Beam "point-blank" whether he had had any sexual contact with M.D. At first, Beam said that he had had a stroke about a week ago—for which he received no medical treatment—and could not remember anything about any sexual contact with M.D. Later during the interview, Trooper Peck returned to the topic. This time, Beam said that M.D. had asked him questions about sex, and his way of answering M.D.'s questions was to have sexual intercourse with her. The troopers read Beam [warnings pursuant to **_Miranda v. Arizona_**, 384 U.S. 436 (1966)] and had him sign a Custodial Written Statement. At the bottom of the page, Beam wrote:

> She comfied [*sic*] in me and was asking sexiul [*sic*] questions and it happened three times I am so sorry [M.D.] you are one of my [] babys [] I Love you and I am so sorry Val I Love you and I am so so sorry. it [*sic*] means sex KLB.

Beam elaborated on the written statement during his interview. Beam told the troopers that he had sex with M.D. three times in the living room of their home between December of 2008 and February of 2009. Beam was crying and said that he felt horrible. He also admitted that he made up the hunting-trip story. The entire interview lasted less than an hour. Afterwards, troopers allowed Beam to talk to Valerie D. He apologized to her and said that he did not tell anyone because he did not want to lose everything.

For her part, M.D. gave a second written statement implicating Beam. Trooper Peck related Beam's information to Trooper Pattillo, who arrested Beam for rape.

Trooper Pattillo referred M.D. to the Children's Resource Center, a children's advocacy center that conducts forensic interviews and medical evaluations of children who are suspected victims of abuse. Shannon Cossaboom, a forensic interviewer, interviewed M.D. twice. Trooper Pattillo was present and witnessed the

> interviews. At the first interview, on March 27, 2009, M.D. had difficulty answering questions, so Cossaboom terminated the interview. The second interview occurred on April 16, 2010. Tapes of each interview were played to the jury at trial. In the interviews, M.D. implicates Beam in a series of ongoing abuse and rapes. She testified to the same under oath at trial, stating that Beam had intercourse with her at least five times.
>
> Because of the alleged rape, M.D. chose to terminate the pregnancy. Trooper Pattillo contacted the clinic regarding deoxyribonucleic acid [DNA] testing on the fetus. [She] was informed that [she] would have to personally witness the abortion and then transport the feus to the state police's crime lab. Because of that fact, and Beam's statement, the Commonwealth and Trooper Pattillo decided not to preserve the fetus for [DNA] testing.

Trial Court Opinion, 5/23/2012, at 1-5 (references to notes of testimony omitted). Following trial, Beam was sentenced to two hundred and forty-nine months to seven hundred and eight months' incarceration.

On November 8, 2012, we affirmed Beam's judgment of sentence. *See Commonwealth v. Beam*, No. 453 MDA 2013, slip op. at 1, 13 (Pa. Super. Nov. 8, 2012). Beam did not file a petition for allowance of appeal with the Pennsylvania Supreme Court.

On June 7, 2013, Beam filed a *pro se* PCRA petition. Counsel was appointed to represent Beam. However, on May 6, 2014, counsel filed a no-merit letter and a petition to withdraw as counsel pursuant to *Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988), and *Commonwealth v. Finley*, 550 A.2d 213 (Pa. Super. 1988) (*en banc*). On May 12, 2014, the PCRA court granted counsel's petition to withdraw as

counsel, and afforded Beam notice of the court's intent to dismiss the petition without a hearing pursuant to Pa.R.Crim.P. 907.

On July 30, 2014, the PCRA court issued an order formally dismissing Beam's PCRA petition and the first of its two opinions in which the court thoroughly analyzed Beam's claims. ***See*** PCRA Court Opinion ("P.C.O."), 7/30/2014, at 9-28. On August 28, 2014, Beam filed a notice of appeal. On that same date, the PCRA court directed Beam to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Beam timely complied. Finally, on October 6, 2014, the PCRA court issued the second of its opinions addressing the claims raised by Beam throughout the PCRA proceedings.

Beam now raises the following seven issues for our review:

I.   Did the PCRA court err when it determined that [Beam] was not denied due process of law as well as [Beam's] 5th Amendment right against self-incrimination [had not been] violated by trial counsel's failure to object to inadmissible statements?

II.  Did the PCRA court err when it determined that [Beam] was not denied due process of law by trial counsel's failure to properly investigate and prepare for trial?

III. Did the PCRA court err when it determined that [Beam] was not denied due process of law by trial counsel's failure to present exculpatory and impeachment evidence?

IV.  Did the PCRA court err when it determined that [Beam] was not denied due process of law by direct appellate counsel's failure to raise meritorious claims of error on appeal and file a petition for allowance of appeal on direct review?

V.     Did the PCRA court err when it determined that [Beam] was not denied due process of law by PCRA counsel's failure to investigate, recognize and present meritorious claims for review?

VI.    Did the PCRA court err when it determined that [Beam] was not denied due process of law when [Beam] received a sentence greater than what he was led to believe and could be run consecutively and did [Beam] receive an unconstitutional sentence?

VII.   Did the PCRA court err when it determined that [Beam] was not denied due process of law when trial and appellate counsel's cumulative errors denied him effective assistance of counsel?

Brief for Beam at 5.

Our review of a PCRA court order dismissing a petition under the PCRA is subject to the following standard:

> We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. We grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Further, where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review is plenary.

**Commonwealth v. Rykard**, 55 A.3d 1177, 1183 (Pa. Super. 2012) (quoting **Commonwealth v. Ford**, 44 A.3d 1190, 1194 (Pa. Super. 2012); internal citations omitted)).

- 6 -

The vast majority of Beam's claims challenge the effectiveness of Beam's trial and appellate counsel. Such claims are governed by the following standard:

> In Pennsylvania, counsel is presumed effective, and a defendant bears the burden of proving otherwise. In order to be entitled to relief on a claim of ineffective assistance of counsel, the PCRA petitioner must plead and prove by a preponderance of the evidence that (1) the underlying claim has arguable merit; (2) counsel whose effectiveness is at issue did not have a reasonable basis for his action or inaction; and (3) the PCRA petitioner suffered prejudice as a result of counsel's action or inaction. When determining whether counsel's actions or omissions were reasonable, we do not question whether there were other more logical course of actions which counsel could have pursued: rather, we must examine whether counsel's decisions had *any* reasonable basis. Further, to establish prejudice, a petitioner must demonstrate that but for the act or omission in question, the outcome of the proceedings would have been different. Where it is clear that a petitioner has failed to meet any of the three, distinct prongs . . ., the claim may be disposed of on that basis alone, without a determination of whether the other two prongs have been met.

*Commonwealth v. Steele*, 961 A.2d 786, 796-97 (Pa. 2008) (citations and internal quotation marks omitted; emphasis in original).

As noted earlier, the PCRA court has thoroughly analyzed most of Beam's issues, and has resolved them in light of the record and the applicable law. Having independently reviewed the record and those claims raised by Beam, we conclude that the PCRA court's ruling is correct and supported by the record. Thus, with respect to issues I-IV, the ineffective assistance of counsel claim with regard to his sentence in issue VI, and issue VII, we adopt the PCRA court's reasoning for denying relief in its two

relevant opinions as our own.[2]  **See** P.C.O., 7/30/2014, at 9-28; P.C.O, 10/6/2014, at 4-14.  Both opinions are attached hereto for convenience.

We are left with two of Beam's claims:  (1) that PCRA counsel was ineffective for failing to investigate, recognize and present meritorious claims for review, **see** supra, Issue V; and (2) that his sentence was unconstitutional pursuant to **Alleyne v. United States**, 133 S.Ct. 2151 (2013), **see** supra, Issue VI.  We take each in turn, and hold that Beam is not entitled to relief.

First, Beam contends that his PCRA counsel was ineffective.  It is now settled that a challenge to the effectiveness of PCRA counsel must first be raised before the PCRA court in a response to PCRA counsel's **Turner**/**Finley** letter (if any), in a response to a PCRA court's Rule 907 notice, or in a new PCRA petition.  **See Commonwealth v. Ford**, 44 A.3d 1190, 1197-98 (Pa. Super. 2012) (citing, inter alia, **Commonwealth v. Pitts**, 981 A.2d 875, 879 n.3, 880 n.4 (Pa. 2009) (finding challenge to PCRA counsel's effectiveness waived because petitioner failed to "challenge[] PCRA counsel's

---

[2]  In issue I, Beam contends that trial counsel was ineffective for failing to object to inadmissible statements.  Before the PCRA court, Beam also argued that appellate counsel was ineffective for failing to raise the issue on direct appeal.  The PCRA court treated this as a layered claim of ineffective assistance of counsel.  **See** P.C.O., 10/6/2014, at 6 (citing **Commonwealth v. McGill**, 832 A.2d 1014, 1023 (Pa. 2003)).  Beam appears to have abandoned the claim with regard to appellate counsel.  Nonetheless, the PCRA court ruled that trial counsel was not ineffective in this regard as part of its discussion of whether appellate counsel was ineffective.  Thus, we rely upon that portion of the court's opinion in resolving Beam's present claim.

stewardship after receiving counsel's withdrawal letter and the notice of the PCRA court's intent to dismiss his petition")).  Thus, in **Ford**, we held that, "when counsel files a **Turner**/**Finley** no-merit letter to the PCRA court, a petitioner must allege any claims of ineffectiveness of PCRA counsel in a response to the court's notice of intent to dismiss."  44 A.3d at 1198.

Beam filed a response to the PCRA court's notice of intent to dismiss, thereby preserving the claim for our review.  Among the thirty-one pages in Beam's response, he only devoted one sentence to this issue, stating that "[i]t is further presented that [PCRA counsel] failed to properly investigate the claims properly [*sic*] and adequately at all, even missing claims that clearly have merit under State and Federal law."  Petitioner's Answer to Purposed [*sic*] Dismissal of Petition for Post-Conviction Collateral Relief, 6/2/2014, at 31.  Beam did not identify the alleged missing claims, nor did he specify in any way what PCRA counsel could have investigated further.  Similarly, in his brief to this Court, Beam alleges that PCRA counsel was ineffective, but again fails to identify the claims that PCRA counsel did not identify or investigate.  Moreover, although Beam thoroughly discusses the applicable standard for ineffective assistance of counsel claims, he does not actually discuss each prong as it relates to his claim that PCRA counsel was ineffective.  Beam in no way demonstrated that he suffered prejudice due to the alleged inadequacies of PCRA counsel.  For these reasons, Beam has not demonstrated that he is entitled to relief.  **See Steele**, *supra*.

Finally, Beam contends that the mandatory minimum sentence that was imposed upon him was illegal pursuant to **Alleyne**. In **Alleyne**, the United States Supreme Court held that "facts that increase mandatory minimum sentences must be submitted to the jury" and must be found beyond a reasonable doubt. **Alleyne**, *supra* at 2163. In light of this holding, Beam maintains that his mandatory minimum sentence must be vacated. The problem with this argument is that Beam's case is not on direct review, but is on review from the denial of his PCRA petition. To be entitled to relief based upon **Alleyne** in this particular procedural context, **Alleyne** must be held to apply retroactively to cases in which the judgment of sentence has become final. Unfortunately for Beam, a panel of this Court most recently held that **Alleyne** does not apply retroactively.

In **Commonwealth v. Riggle**, ___ A.3d ___, 2015 WL 4094427 (Pa. Super. 2015), the PCRA-appellant sought relief under **Alleyne**, as Beam does here. **Id.** at *3-4. A panel of this Court recognized that, to date, no Pennsylvania court had determined whether **Alleyne** "is fully retroactive and to be applied on collateral review." **Id.** at *4. The panel noted that the correct test to apply is derived from the United States Supreme Court's decision in **Teague v. Lane**, 489 U.S. 288 (1989).

> Under the **Teague** framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are on direct review. A new rule applies retroactively in a collateral proceeding only (1) if the rule is substantive or (2) the rule is a 'watershed rule of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding.

*Riggle*, *supra*, at \*4 (quoting *Whorton v. Bockting*, 549 U.S. 406, 416 (2007) (internal citations omitted)).  Following a comprehensive application of *Alleyne* within the *Teague* framework, the panel held that *Alleyne* "is not entitled to retroactive effect in [the] PCRA setting."  *Riggle*, *supra*, at \*6.  Consequently, in light of *Riggle*, Beam is not entitled to the benefit of *Alleyne*'s holding.

For all of the preceding reasons, Beam is not entitled to PCRA relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>7/28/2015</u>

# IN THE COURT OF COMMON PLEAS
## OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA
### FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| Commonwealth of Pennsylvania, | : | Criminal Action |
| | : | |
| | : | No. 499-2009 |
| vs. | : | |
| | : | |
| | : | |
| Kevin Lee Beam, | : | *Post Conviction Relief Act* |
| Defendant | : | Honorable Carol L. Van Horn |

## OPINION AND ORDER OF COURT

Before Van Horn, J.

Filed    JUL 3 0 2014

*Judith L. Smith*
          Clerk

IN THE COURT OF COMMON PLEAS
OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA
FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| Commonwealth of Pennsylvania, | : | Criminal Action |
| | : | |
| | : | No. 499-2009 |
| vs. | : | |
| | : | |
| | : | |
| Kevin Lee Beam, | : | *Post Conviction Relief Act* |
| Defendant | : | Honorable Carol L. Van Horn |

## STATEMENT OF THE CASE

On August 2, 2011, Kevin Lee Be4am ["Petitioner" or "Defendant"] was found guilty by

a jury of his peers of rape,[1] criminal attempt to commit involuntary deviate sexual intercourse,[2]

aggravated indecent assault,[3] indecent assault,[4] and endangering the welfare of a child.[5]

## BACKGROUND[6]

On March 18, 2009, Valerie D., M.D., and Kevin Beam
went to the Pennsylvania State Police Barracks in Chambersburg
to report that M.D. had been raped. N.T., 8/1/11 at 122; N.T.,
8/2/11, at 5-6. M.D. was 14 years old at the time, and she was
pregnant. N.T., 8/1/11, at 111. Valerie D. is her natural mother. Id.
at 72. Beam was Valerie D.'s girlfriend, and at the time, he was
about 35 years old. Id. at 73-76. Though Valerie D. and Beam were
never married, they had been in a long-term relationship, and M.D.
referred to Beam as "dad" "most of the time." Id. at 27, 74.

The day before, Valerie D. discovered that M.D. appeared
to be pregnant. N.T., 8/1/11, 38-39, 77-78. She went to K-Mart to
get a pregnancy test for M.D., which came back positive. Id. at 39,
78. On the way to the store, Beam called Valerie D. and said that
he had "something to tell [her]." Id. at 77. When she returned
home, Beam told Valerie D. that he and M.D. had been hunting in
the woods a few months ago. Id. M.D. got cold, so Beam took her
back to their car, a Chevy Blazer. At some point, M.D. got out of

---

[1] 18 Pa. C.S. § 3121(a)(2).
[2] 18 Pa. C.S. §§ 901(a) & 3123(a)(7).
[3] 18 Pa. C.S. § 3125(a)(1).
[4] 18 Pa. C.S. § 3126(a)(8).
[5] 18 Pa. C.S. § 4304(a)(1).
[6] The following Background and Procedural History is excerpted from the Court's May 23, 2012 Opinion filed in accordance with Pa.R.A.P. 1925(a) authored by the Honorable Richard Walsh.

the Blazer to go to the bathroom, when two unidentified, unknown individuals attacked and seized her. Id. at 40-41, 77-78. One held her down, and the other raped her. Id. at 40-41, 77-78. When Valerie D. asked why Beam had not told anyone about the story, he said that M.D. did not want her mother to know about the incident. Id. at 78.

Unsurprisingly, the hunting story was a complete fabrication, invented by Beam to hide his own culpability. Id. at 40-41. According to M.D., he made up the story on the night of March 17, 2009. Id. at 41. On the way to the state police barracks, the three stopped at a gas station to get gas. While Valerie D. was inside the convenience store, Beam told M.D. to stick to his story. Id. While being interviewed, M.D. told police the same story that Beam had told Valerie D. the night before: that a stranger had violated her during a hunting trip. Id. at 40-43. She gave Trooper Courtney Pattillo, a criminal investigator, a written statement to that effect. Id. at 40-43, 53-54, 123-24; N.T., 8/2/11, at 6-7: Def.'s Ex. 2.

During the interview, M.D. was having a hard time answering questions, so Trooper Pattillo had Beam, then Valerie D., leave the interview room. N.T., 8/2/11, at 7. Troopers G. David Peck and Jason Cachara interviewed Beam separately at the behest of Trooper Pattillo. Id. at 8. He had an overall feeling that some things about the hunting story were not making sense. Id. at 8.

Troopers Peck and Cachara first began to interview Beam as an eyewitness, or more properly, the first person to see to M.D. after the alleged hunting-trip rape. N.T., 8/1/11, at 123. According to Trooper Peck, Beam answered questions slowly and with his head down. Id. at 124. The troopers were incredulous that Beam had told no one of the strangers' alleged rape of M.D. for over three months, but they were unsuccessful in finding out why he failed to disclose the story. Id. Eventually, Trooper Peck asked Beam "point-blank" whether he had had any sexual contact with M.D. Id. At first, Beam said that he had had a stroke about a week ago—for which he received no medical treatment—and could not remember anything about any sexual contact with M.D. Id. at 124-25. Later during the interview, Trooper Peck returned to the topic. This time, Beam said that M.D. had asked him questions about sex, and that his way of answering M.D.'s questions was to have sexual intercourse with her. Id. at 126. The troopers read Beam Miranda[7] warnings and had him sign a Custodial Written Statement. Id. at 124-28, Com.'s Ex. 3-A. At the bottom of the page, Beam wrote:

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

> She comfied in me and was asking sexiul questions and it hapened three times I am so sorry [M.D.'s nickname] you are one of my [non-grammatical marking] babys [non-grammatical marking] I Love you and I am so sorry Val I Love you and I am so so sorry. it means sex KLB.

Com's Ex. 3-A; <u>see</u> N.T., 8/1/11, at 128, 136-39.[8] Beam elaborated on the written statement during his interview. Beam told the troopers that he had sex with M.D. three times in the living room of their home between December of 2008 and February of 2009. N.T., 8/1/11, at 130. Beam was crying and said that he felt horrible. <u>Id.</u> He also admitted that he made up the hunting-trip story. <u>Id.</u> The entire interview lasted less than an hour. <u>Id.</u> Afterward, troopers allowed Beam to talk to Valerie D. He apologized to her and said that he did not tell anyone because he did not want to lose everything. <u>Id.</u> at 131.

For her part, M.D. gave a second written statement implicating Beam. <u>Id.</u> at 55-56; Def.'s Ex. 4. Trooper Peck relayed Beam's information to Trooper Pattillo, who arrested Beam for rape. N.T., 8/1/11, at 131; N.T., 8/2/11, at 11.

Trooper Pattillo referred M.D. to the Children's Resource Center, a children's advocacy center that conducts forensic interviews and medical evaluations of children who are suspected victims of abuse. N.T., 8/2/11, at 9-10, N.T., 8/1/11, at 102-103. Shanno Cossaboom, a forensic interviewer, interviewed M.D. twice. Trooper Pattillo was present and witnessed the interviews. At the first interview, on March 27, 2009, M.D. had difficulty answering questions, so Cossaboom terminated the interview. N.T., 8/1/11, at 106. The second interview occurred on April 16, 2010. <u>Id.</u> at 107-08. Tapes of each interview were played to the jury at trial. <u>Id.</u> at 116-20. In the interviews, M.D. implicates Beam in a series of ongoing abuse and rapes. She testified to the same under oath at trial, stating that Beam had intercourse with her at least five times. <u>Id.</u> at 33-34.

Because of the alleged rape, M.D. chose to terminate the pregnancy. <u>Id.</u> at 45-46. As will be important below, Trooper Pattillo contacted the clinic regarding deoxyribonucleic-acid testing of the fetus. <u>Id.</u> at 9-10. He was informed that he would have to personally witness the abortion and then transport the fetus to the state police's crime lab. <u>Id.</u> at 9-10. Because of that fact, and

---

[8] All grammatical and spelling errors are in the original statement. Beam wrote the final at Trooper Peck's request, to clarify that "it happened three times" meant that Beam had sexual intercourse with M.D. three times. N.T., 8/1/11, at 127.

4

Beam's statement, the Commonwealth and Trooper Pattillo decided not to preserve the fetus for testing.

## PROCEDURAL HISTORY

Trooper Pattillo originally charged Beam with seventeen counts on March 18, 2009.[9] Represented by Chief Public Defender Michael J. Toms, Esq., Beam waived his preliminary hearing. The charges were bound over for court, after which Beam waived formal arraignment.[10]

### I. Beam's Competency Issues

On June 16, 2009, Beam moved for a psychiatric evaluation to determine his competency. The next day, the Honorable Carol L. Van Horn granted Beam's motion and appointed mental health counsel. She also appointed Dr. John Hume to evaluate Beam. The Court received Dr. Hume's report, and on December 7, 2009, Judge Van Horn found Beam not competent to stand trial and ordered him committed to Torrance State Hospital for evaluation pursuant to the Mental Health Procedures Act, 50 P.S. §§ 7402-03, with a directive to resume criminal proceedings when Beam's competence was restored. On February 4, 2010, Judge Van Horn extended Beams commitment for another 60 days based upon the opinion of Dr. Daleep Rathore, who opined that further treatment was necessary. Dr. Rathore noted that Beam's diagnosis at that time was depression, not otherwise specified, and history of alcohol abuse. Beam's competency was eventually restored, and he returned to Franklin County to answer to the criminal charges in early April 2010.

### II. Entry and Withdrawal of Plea

After some pretrial proceedings that are not relevant here, Beam entered into a plea deal on October 25, 2010. He agreed to plead guilty to aggravated indecent assault and statutory sexual assault. In exchange, the Commonwealth agreed to dismiss the remaining charges and to consecutive sentences of 8–16 years for aggravated indecent assault and 1–2 years for statutory sexual assault. Beam equivocated somewhat on his written plea colloquy, specifically with regard to his satisfaction with his counsel's

---

[9] They were six counts of rape, sexual assault, criminal attempt to commit involuntary deviate sexual intercourse, three counts of aggravated indecent assault, two counts of indecent assault, endangering the welfare of a child, and three counts of statutory sexual assault.

[10] The Commonwealth chose not to file informations on several of the charges listed in the previous footnote.

5

representation and with the voluntariness of the plea. Ultimately, however, Beam agreed to the plea, and this Judge accepted it. The Court also ordered an evaluation of Beam by the Sexual Offenders Assessment Board as required by Megan's Law II.

Five days later, Beam sent a letter to the Clerk claiming that Attorney Toms had provided ineffective assistance of counsel and claimed that he "was forced to take another plea." Concerned, the Court ordered Beam brought before us for a hearing on December 8, 2010 to ascertain whether Beam's plea was involuntary. After the hearing, the Court allowed the Commonwealth time to respond to Beam's oral motion to withdraw his plea. The Commonwealth indicated that it was ready to take the case to trial; therefore, on January 18, 2011, the Court directed withdrawal of Beam's plea and set the matter for trial. The Court further vacated the Public Defender's appointment and appointed new counsel.[11]

## III.  Pretrial Motions

On July 1, 2011, the Court pre-tried the case. Attorney Annie R. Gómez, Esq., appeared on behalf of Beam. Our pretrial order noted that Beam was going to trial on eight counts, with trial set for August 1 and 2, 2011.

## A.  Beam's Motion to Dismiss

The next significant event occurred on July 18, 2011, when Beam filed a counseled motion to dismiss. In the motion, Beam alleged that the Commonwealth committed a Brady[12] violation by failing to preserve the DNA from the aborted fetus. He asked for dismissal or, in the alternative, an adverse inference jury instruction, Pennsylvania Standard Suggested Criminal Jury Instruction 3.21B. Per Court order, the Commonwealth responded by denying that the DNA was Brady evidence. The Court ordered a hearing on the motion on August 1, 2011, the morning of the first day of trial.

At the Court noted above, M.D. had an abortion. The fetus was destroyed, and no DNA testing was done to establish paternity. Trooper Pattillo, on the advice of the District Attorney's Office, did not do so for several reasons. He strongly believed that Beam was the father of the fetus. He also had a signed, written confession. Finally, he believed that he had to personally witness the abortion, per clinic and Pennsylvania State Police evidence-

---

[11] It should be noted that Beam sent numerous letters to the Court, or filings to the Clerk, all of which were filed pursuant to Pennsylvania Rule of Criminal Procedure 576(A)(4) and (5).

[12] Brady v. Maryland, 373 U.S. 83 (1963).

collection protocol, and he did not want to re-victimize M.D. by being present. N.T., 8/1/11, at 10-11. The District Attorney's Office was of the same mind. It believed that any DNA testing would be merely corroborative, as M.D. had never had sexual intercourse with anyone else. Admittedly, Trooper Pattillo had no experience in collecting evidence from aborted fetuses. He did not discover that M.D. would have been, and indeed was, under general anesthesia during the abortion. Id. at 12-14. On cross-examination, Beam asked Trooper Pattillo whether he was aware of statements that M.D. made about "hooking up" with a boyfriend on February 20, 2009. Id. at 16-18. Trooper Pattillo did not remember those statements. He testified that even if M.D. had "hooked up" with a boyfriend, and even if to M.D. "hooking up" meant intercourse, he did not think that the boyfriend could have been the father of the fetus. The medical report indicated that M.D. was six to eight weeks pregnant on March 18, 2009, temporally ruling out the boyfriend as a putative father.

## B.     The Commonwealth's Motion in Limine to Preclude Reference to Beam's IQ

Also significant, on July 28, the Commonwealth filed a motion in limine. In the motion, it averred that Attorney Gómez had stated, via email, that she intended to introduce into evidence the fact that Beam has an IQ of 71. She got this information from Beam's mental health records provided by Torrance State Hospital. The Court ordered a response, which Beam filed. He indicated that the purpose of the evidence was to explain the rudimentary nature of his written statement to state police.

The Court denied Beam's motion to dismiss, specifically finding that no due process violation occurred. We took under advisement a request for jury instruction 3.21B. We also granted the Commonwealth's motion in limine and excluded any evidence referencing Beam's IQ of 71.

## IV.     The Trial

Immediately after the ruling on the motions, trial began. At trial, the story unfolded as recounted above. M.D. testified that Beam began to have sexual contact with her when she was about 13. N.T., 8/1/11, at 28. She said that the contact began as inappropriate touching, which escalated to more serious abuse. Id. at 29-32. Eventually, Beam had sexual intercourse with M.D. multiple times. Id. at 32-34. He also tried unsuccessfully, to take nude pictures of M.D. Id. at 36. M.D. said that Beam told her not to tell anybody because "he would be gone" and M.D.'s half-sister

7

(Valerie D. and Beam's child) would not have a father. Id. at 36-37. On cross-examination, M.D. was asked questions about "hooking up" with a boyfriend, and whether she had made a statement during her forensic interview by the Children's Resource Center. Id. at 58-59. When asked what "hooked up" meant, she said "[p]robably that I was going out with him." Id. at 59. M.D. was also cross-examined on the hunting-trip story. Id. at 52-55

Valerie D. testified about how she discovered that M.D. was pregnant, and about her former relationship with Beam. Id. at 76. She said that she took M.D. to Chambersburg Hospital for examination on March 18, 2009, immediately after they left the state police barracks. Id. at 89. An emergency room nurse from Chambersburg Hospital read the intake report from M.D.'s visit to the hospital. According to the report, Valerie D. thought that M.D. was having nonconsensual intercourse with her, i.e. Valerie D.'s, boyfriend. Id. at 98. The hospital's examination indicated that M.D. was six to eight weeks pregnant. Id.

The Commonwealth also presented evidence from two employees of the Children's Resource Center, to describe M.D.'s interviews and to lay the foundation for admitting the DVDs of the interviews. Finally, Troopers Peck and Pattillo testified about their investigation and interviews of the participants.

Beam presented no evidence. Instead, he rested on his right to remain silent.

The trial lasted two days. On August 2, the jury found Beam guilty of rape, criminal attempt to commit involuntary deviate sexual intercourse (IDSI), aggravated indecent assault, indecent assault, and endangering the welfare of a child.[13] The Court ordered a full presentence investigation report and a second assessment of Beam by the Sexual Offenders Assessment Board. Later, the Court appointed an expert to rebut the Board's finding that Beam was a sexually violent predator (SVP).

## V. Sentence, Post-Sentence Motion, and Appeal

On January 23, 2012, the Court held hearings to determine Beam's SVP status and to sentence him. After receiving evidence and argument, the Court determined that Beam is not an SVP. We moved immediately into sentencing. The Court imposed sentences as recommended by the Commonwealth: for rape, 12–240 months; for attempted IDSI, 54–240 months; for aggravated indecent assault 60–120 months; for indecent assault, 3–24 months; and for endangering the welfare of a child, 12–84 months. Beam was

---

[13] 18 Pa. C.S. §§ 3121(a)(2), 901(a) and 3123(a)(7), 3126(a)(8), and 4304. The remaining three charges were nol prossed at the beginning of trial.

8

subject to mandatory minimum sentences of ten years for the rape conviction, and five years for the aggravated indecent assault conviction.[14] The sentences—which are all within the standard range of the Sentencing Guidelines—total 244–708 months, or 20 years and 9 months to 59 years. They include, of course, include other costs, fines, and conditions which are irrelevant for purposes of the appeal.

On February 1, 2012, Beam filed a post-sentence motion for a new trial. The sole ground in support was that the jury's verdict was contrary to the weight of the evidence. The Court denied the motion without opinion or comment on February 6, 2012.

This appeal followed on February 28, 2012. The next day, we ordered Beam to file a statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b)(2). On March 20, Beam timely filed his Rule 1925(b) concise statement. On the same date, Attorney Gómez moved to withdraw as counsel, alleging that certain highly inappropriate letters Beam sent her had destroyed the attorney-client relationship.[15] We granted the motion on March 21, 2012, and appointed Todd Sponseller, Esq., to represent Beam for the purposes of this appeal.

(Opinion Sur Pa.R.A.P. 1925(a), 5/23/2012, at 1-10). The Honorable Richard Walsh handled the instant case pre-trial through the appeal. The case is now before the undersigned for post-conviction relief proceedings.

## DISCUSSION

### I. Post Conviction Relief Act

The Post Conviction Relief Act (PCRA) was enacted to provide individuals who are convicted of crimes for which they are innocent, or those serving illegal sentences, with a means to obtain collateral relief. *See* 42 Pa.C.S. § 9543. First, the defendant must demonstrate he was convicted of a crime under the law of Pennsylvania, and that he is currently serving a sentence or waiting to do so. *See* 42 Pa. C.S. §9543(a)(1). Second, the petitioner must prove, by a

---

[14] On July 18, 2011, the Commonwealth filed a notice of intention to proceed on mandatory minimum sentences.

[15] Given the nature of the communications, we granted the motion without a hearing.

9

preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated statutory factors. *See* 42 Pa. C.S. §9543(a)(2). Third, a petitioner must demonstrate the issues raised under the Act have not been previously litigated or waived, and finally, that the failure to litigate such issues could not have resulted from a rational, strategic, or tactical decision by counsel. *See id.* at §9543(a)(1), (3), (4). "Inherent in this pleading and proof requirement is that the petitioner must not only state what his issues are, but also he must demonstrate in his pleadings and briefs how the issues will be proved." *Commonwealth v. Rivers*, 786 A.2d 923, 927 (Pa. 2001).

## A. Claims of Ineffective Assistance of Counsel

Among the statutory factors from which a conviction or sentence may have resulted creating an entitlement to post-conviction relief is the ineffective assistance of counsel. 42 Pa.C.S. §9543(a)(2)(ii). In light of the particular circumstances of a case, the ineffective assistance of counsel must have so undermined the truth-determining process that "no reliable adjudication of guilt or innocence could have taken place." *Id.*

Counsel is presumed effective. *See Commonwealth v. Martin*, 5 A.3d 177, 183 (Pa. 2010). The defendant bears the burden of proving otherwise, accomplished by satisfying the three-pronged test laid out by our appellate courts in *Pierce. See Commonwealth v. Pierce*, 786 A.2d 203, 213 (Pa. 2001). First, the defendant must show the underlying substantive claim has arguable merit. *See id.* Second, it must be demonstrated that counsel did not have any reasonable basis for their acts or failure to act designed to effectuate the client's interest. *See id.* Finally, a petitioner must demonstrate actual prejudice resulted from counsel's inadequate performance. *See id.* A petitioner demonstrates prejudice where he proves that "there is a

10

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Commonwealth v. Johnson,* 966 A.2d 523, 533 (Pa. 2009).

Failure to satisfy any of the three prongs of the test will result in denial of the claimed ineffective assistance. *See Pierce,* 786 A.2d at 221-22. The inquiry mirrors that set forth by the United States Supreme Court, requiring both a showing that counsel's performance was deficient, and that such deficiency was prejudicial. *See Strickland v. Washington,* 466 U.S. 668, 687-91, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). Finally, it has been repeatedly held that "no number of failed [ineffectiveness] claims may collectively warrant relief if they fail to do so individually." *Johnson,* 966 A.2d at 532 (citations omitted). Pursuant to the above standards, this Court now analyzes the issues raised by the Beam.

As discussed below, Beam makes several allegations of counsel ineffectiveness, none of which have merit. Beam presents his allegations in a highly disorganized manner and the Court will attempt to address each claim of error with clarity below.

First, Beam was represented by Attorney Toms at the start of his proceedings. He makes a general averment that Attorney Toms was ineffective for not "going after" exculpatory evidence and investigating the case thoroughly. Beam's claim fails to show actual prejudice and does not meet the third prong of the *Pierce* test. Beam has not identified any exculpatory evidence Attorney Toms failed to "go after" and he does not explain how Attorney Toms failed to investigate the case. In essence, Beam has failed entirely to prove that because of Attorney Tom's alleged errors, there is a reasonable probability that the outcome of the proceedings would have been different.

Second, the law Office of James Reed was court-appointed to represent Beam, and he argues that Attorney Reed was ineffective because he only met with Beam one time. As noted

11

above with Attorney Toms, here, Beam only makes a general claim of ineffectiveness and he has failed to meet the third prong of *Pierce*. He does not allege that he suffered any prejudice due to Attorney Reed's failure to meet with him more than once. Moreover, Attorney Reed was not Beam's trial or appellate counsel, and Beam's PCRA counsel asserted in his Turner/Finley letter that he did not discover any specific acts or omissions by Attorney Reed to support an ineffectiveness claim. (*See* Turner/Finley Letter, 5/6/2014, at 17). Accordingly, such a claim against Attorney Reed lacks merit.

Third, Attorney Gómez, working for Attorney Reed, took on Beam's case as trial counsel. Beam argues that she only had one month to prepare for trial which was not enough time; therefore she was ineffective for failing to request a continuance. Beam argues specifically that there was not adequate time to investigate the failure of the Commonwealth to preserve DNA evidence from the aborted fetus. This latter assertion lacks merit as Attorney Gómez filed a motion to dismiss before trial alleging that the Commonwealth committed a *Brady*[16] violation by failing to preserve the DNA from the fetus. Clearly, Attorney Gómez had investigated the issue. Overall, Beam has also not shown actual prejudice as he has failed to prove there was a reasonable probability that the proceedings would have resulted differently if Attorney Gómez had more time to prepare for trial. *See Commonwealth v. Wright*, 961 A.2d 119, 132 (Pa. 2008) ("mere brevity of time to confer with counsel before trial does not constitute ineffective assistance."); *See also Commonwealth v. Williams*, 950 A.2d 294, 313 (Pa. 2008) (counsel is not *per se* ineffective upon having a short amount of time to prepare for trial). In fact, to the contrary, the Court agrees with PCRA counsel in his Turner/Finley letter that the record of the case and the trial transcripts clearly show that Attorney Gómez performed at trial in an

---

[16] *Brady v. Maryland*, 373 U.S. 83 (1963).

adequately prepared manner. (*See* Turner/Finley Letter, 5/6/2014, at 18). Beam's claim does not meet the *Pierce* test and fails.

Fourth, Beam notes that his motion to dismiss (or suppression motion as he refers to it) was denied on August 1, 2011, the morning of trial. Beam argues that Attorney Gómez was ineffective for failing to "push the issue" of having the suppression hearing take place before the day of Beam's trial. Beam notes that had she acted in such a manner, "perhaps maybe" she could have built a better defense. Beam's argument fails the first prong of the *Pierce* test as he has not shown that his underlying substantive claim has arguable merit. The motion to dismiss was filed on July 18, 2011, and the Court's calendar, not counsel, controls the scheduling of hearings. Beam has not shown how, if at all, Attorney Gómez had the ability to "push the issue" with the Court of holding a hearing sooner. Additionally, Beam's statement that "perhaps maybe" Attorney Gómez could have built a better defense had she pushed the Court to decide the motion prior to trial is pure conjecture and Beam has not shown that there was a reasonable probability that the proceedings would have resulted differently. Once again, Beam has not established the third prong of *Pierce* as he has failed to prove prejudice resulted from Attorney Gómez's alleged errors.

Fifth, Beam argues that Attorney Gómez never challenged the victim's credibility regarding inconsistent statements, nor questioned her inaccuracies, discrepancies, and contradictions. This argument lacks merit as it is clear from the trial transcripts that Attorney Gómez attacked the victim's credibility and cross-examined her on her prior inconsistent statements. For example, when M.D. denied taking a sexual education class at school, Attorney Gómez questioned the accuracy of that statement because M.D. had previously told Shannon Cossaboom that she had a health class with sexual education. (N.T., 8/1/2011, at 50-51).

13

Attorney Gómez also impeached the victim with three written statements she made to police on March 18, 2009, the first, describing how she was raped by two men in the woods on the hunting trip, the second and third, incriminating Beam. *Id.* at 52-54. Attorney Gómez clearly brought to the jury's attention the differences in the statements and emphasized that the victim provided more specific details in her first statement about the purported attack in the woods. *Id.* at 56. Attorney Gómez also questioned the victim on her prior statements that she had a boyfriend and they "hooked up." *Id.* at 58. Furthermore, Attorney Gómez attacked M.D.'s credibility and discussed her inconsistent statements in her closing when she stated the following:

> . . . [A] 14 year old girl could be suggested to say things? She gave three different statements within an hour, within less than an hour, the first involving two men in the woods being very specific. The second involving Kevin. The third involving Kevin. There was then a statement given at the emergency room just a few hours after she was at the police station. And this statement in the history, as was read to you by Nurse Morgan, this is a 14 year old female who was brought to the emergency department by her mother. She thought that the child has been having intercourse with her boyfriend. Is that her mother's statement? Is that the child's statement? If it is her mother's statement, was the mother saying just a few hours after they were at the police station that the mother thought her daughter was having intercourse with that boyfriend we heard about, that Brett Massey? Was her mother saying that she thought her daughter was having intercourse with Kevin which was her mother's boyfriend. Do we know what this statement means? I suggest to you not only was [M.D.] led through her questioning at the police station but also by Miss Cossaboom at the Children's Resource Center. Miss Cossaboom in her testimony here in the courtroom tried to indicate that she did not ask leading questions. I suggest after watching that video that she did ask leading questions. A lot of her questions resulted in yes or no answers. They weren't open-ended questions. They did not being with who, what, where, when, and why. They began with did this happen to you, did you hear about this? Did you see that? Thinking about this statement at the ER. She thought that the child had been having intercourse with her boyfriend. When the mother, Valerie Deree testified she said her first thought when she saw her 14 year old daughter in the bathtub with a little bit of a belly was that she was pregnant. Her first thought? Her 14 year

14

old daughter? Not that her body was changing, not that she had gained a little bit of weight or ate a little more that day or was a little bloated but that she was pregnant. Why was that her first thought? Was it because she thought that [M.D.] was having intercourse with Brett Massy?

. . .

What does this come down to? Inconsistent statements of a young girl. Two men do this to her in the woods. Then it's Kevin. Then we have the statements at the hospital about this boyfriend. We have her saying in the Children's Resource Center video that she hooked up with this boyfriend February 20 of 2009.

(N.T., [Transcript of Proceedings of Closings] 8/2/2011, at 3-10). PCRA counsel, Attorney Bayley, stated in his Turner/Finley letter besides the different statements given to police which Attorney Gómez addressed, he had not "identified any 'inaccuracies, discrepancies, or contradictions' that were not addressed by Attorney Gómez that would have provided any aid whatsoever to Mr. Beam's defense." (Turner/Finley Letter, 5/21/2014, at 20). Accordingly, Beam's claims fail the first prong of the *Pierce* test as they lack arguable merit.

Sixth, Beam argues that Attorney Gómez was ineffective because he would not have received a sentence greater than the lawful maximum had Attorney Gómez not received his case only one month prior to trial. Such a claim is meritless as the sentences relating to each count are not greater than the lawful maximum.

Seventh, Beam argues that Attorney Gómez was ineffective for failing move for a dismissal because the Commonwealth produced insufficient evidence to sustain his convictions. A similar issue arose in in *Commonwealth v. Natividad*, 938 A.2d 310, 329 (Pa. 2007). In *Natividad*, the defendant argued that his appellate counsel was ineffective for failing to properly litigate and challenge the sufficiency of the evidence on appeal because his statement of the case was deficient and he failed to file a reply brief or petition for reargument. *Id.* Such failures prevented the Supreme Court from properly resolving the claim. *Id.* Pursuant to the

15

requirements of a successful ineffective assistance claim, the Pennsylvania Supreme Court reasoned that, "a petitioner must plead and prove properly all the elements of the *Pierce* test." *Id.* The court found that the defendant's claim failed because he argued "the merits of his underlying claim in substantial depth and also argue[d] prejudice, but fail[ed] to mention, let alone plead and prove, the 'reasonable strategy' prong." *Id.*

Similarly in the instant case, Beam has failed to plead the three prongs of *Pierce*. He makes the blanket assertion that counsel was "ineffective due to failure to object to the insufficiency of the evidence . . ." (*See* PCRA Petition, 6/7/2013, at 19). He fails the third prong as he has not shown that he suffered any actual prejudice. In other words, Beam has not established that had Attorney Gómez raised a sufficiency claim, there is a reasonable probability that the result of the proceeding would have been different. *See Commonwealth v. Johnson*, 966 A.2d 523, 533 (Pa. 2009). Also, like *Natividad*, Beam has failed to plead or even establish that Attorney Gómez did not have a reasonable basis or reasonable strategy for not challenging the sufficiency of the evidence, implicating the second prong of *Pierce*. To the contrary, the Court can discern Attorney Gómez's reasonable strategy through her post-sentence actions as she filed a timely post-sentence motion arguing that the verdict was against the weight of the evidence. "A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict." *Commonwealth v. Rivera*, 983 A.2d 1211, 1225 (Pa. 2009) (citation omitted). "[I]t is not enough to say that there was something wrong with what counsel did; the petitioner must also demonstrate that there was no reasonable basis for counsel's act." *Commonwealth v. Rivers*, 786 A.2d 923, 931 (Pa. 2001). After evaluating the evidence presented at trial, clearly Attorney Gómez believed that a weight

16

of the evidence claim would be more advantageous to Beam's case than a sufficiency of the evidence claim. As such, Beam's ineffectiveness claim lacks merit.

Eighth, Beam argues that Attorney Gómez was ineffective for failing to request a taint hearing with regard to the admissibility of M.D.'s previous statements and testimony at trial. "Taint" is considered "the implantation of false memories or distortion of actual memories through improper and suggestive interview techniques." *Commonwealth v. Delbridge*, 855 A.2d 27, 30 (Pa. 2003). When an allegation of taint is made, an appropriate investigation into the issue is to hold a competency hearing because the issue of "taint" is relevant to a competency determination and "[a] child's competency to testify is a threshold legal issue that a trial court must decide, . . ." *Commonwealth v. Pena*, 31 A.3d 704, 706 (Pa. Super. 2011); *see also Commonwealth v. Delbridge*, 855 A.2d 27, 41 (Pa. 2003). All witnesses are presumed competent. "A party who challenges the competency of a minor witness must prove by clear and convincing evidence that the witness lacks 'the minimal capacity ... (1) to communicate, (2) to observe an event and accurately recall that observation, and (3) to understand the necessity to speak the truth.'" *Pena*, 31 A.3d at 707 (quoting *Delbridge*, 855 A.2d at 40). Allegations of taint implicate the second prong, as it addresses the witness' mental capacity to observe an event and the capacity to accurately recall or remember that observation. *Pena*, 31 A.3d at 707.

> In discussing testimonial competency, Pennsylvania courts have clearly and unequivocally stated that taint is only 'a legitimate question for examination in cases involving complaints of sexual abuse made by *young children.*' *Delbridge I*, 855 A.2d at 39 (emphasis added). When a witness is at least fourteen years old, he or she is entitled to the same presumption of competence as an adult witness. *Rosche v. McCoy*, 397 Pa. 615, 156 A.2d 307, 310 (1959). In *Commonwealth v. Judd*, 897 A.2d 1224 (Pa. Super. 2006), *appeal denied*, 590 Pa. 675, 912 A.2d 1291 (2006), this Court held that because the juvenile sexual assault victim 'was fifteen years old when she *testified at trial* ..., any issue with her ability to correctly remember the events in question is properly a

17

question of credibility not of taint.' *Judd,* 897 A.2d at 1229 (emphasis added). Further, the concerns underlying the three-part test for evaluating the testimonial competency of minors 'become less relevant as the witness's age increases, ultimately being rendered *totally irrelevant as a matter of law by age fourteen.' Id.* (emphasis added). In *Commonwealth v. Moore,* 980 A.2d 647 (Pa. Super. 2009), this Court reiterated that the critical age for purposes of conducting a taint hearing is not the age at the time of the crime but the age at the time of trial. *Moore,* 980 A.2d at 648, 652 (where the minor witness was thirteen at the time of the crime but fourteen at the time of trial, the witness 'did not require a competency hearing. Any issues regarding [the witness]'s observation of the incident in question is a question of credibility and does not implicate taint.... [prior decisions of the Pennsylvania courts] preclude a competency hearing for [a] fourteen-year-old....').

*Pena,* 31 A.3d at 706-707. The victim in the instant case was 17 years old at the time of trial. Consequently, as PCRA counsel notes in his Turner/Finley letter, any taint proceedings would have been "totally irrelevant as a matter of law." *Commonwealth v. Judd,* 897 A.2d 1224, 1229 (Pa. Super. 2006); (*see* Turner/Finley Letter, 5/5/2014, at 22). As such, Attorney Gómez was not ineffective for failing to pursue said hearing. Beam's claim fails.

Ninth, Beam argues that his appellate counsel, Attorney Sponseller, also rendered ineffective assistance of counsel. He argues that Attorney Sponseller "pulled documents out of the appeal" pertaining to the following issues: the destruction of the fetus, how Beam was coached into giving a confession, how his *Miranda* rights were violated during the interrogation, and how the interrogation was not audio or video recorded. First, Beam has provided no proof of such conduct. Second, "[m]erely stating that there is something wrong with what counsel did, that his action violated the constitution . . . does not meet the requirements of an ineffectiveness claim." *Commonwealth v. Rivers,* 786 A.2d 923, 931 (Pa. 2001). Beam's baseless, generalized claim is without merit.

18

Tenth, Beam asserts that both Gómez and Sponseller were ineffective for failing to explain to him that his charges could run consecutively,[17] which "caused prejudice by all of the attorney's inaction." Beam's claims fail the third prong of the *Pierce* test as he has not shown actual prejudice. Prejudice is demonstrated where a defendant proves that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Commonwealth v. Johnson*, 966 A.2d 523, 533 (Pa. 2009). Beam was tried and convicted by a jury of his peers. After a conviction, sentencing is in the sound discretion of the trial court, and "[g]enerally, Pennsylvania law 'affords the sentencing court discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed.'" *Commonwealth v. Prisk*, 13 A.3d 526, 533 (Pa. Super. 2011) (quoting *Commonwealth v. Pass*, 914 A.2d 442, 446–47 (Pa. Super. 2006)). Beam has not shown or even alleged how his attorneys' failure to inform him of the possibility of consecutive sentences would have altered or changed Judge Walsh's sentencing scheme. His claims are without merit.

Eleventh, Beam argues that Attorney Sponseller did not raise on appeal the issue of the Commonwealth's failure to secure the victim's fetus whereby preventing DNA evidence. Beam's claim is meritless as Attorney Sponseller did in fact raise this very issue on appeal. (*See* Superior Court Memorandum filed November 8, 2012).

Each of the ineffective assistance of counsel claims raised by Beam lacks merit. Additionally, each of the claims of ineffectiveness of Attorney Toms, Attorney Reed, and Attorney Gómez are technically waived because the Beam was appointed a new attorney to represent him on appeal, Attorney Sponseller. Therefore, any claims against trial counsels could

---

[17] Beam cites *Commonwealth v. Diehl*, 61 A.3d 265, 266 (Pa. Super. 2013) for support, which is inapplicable here as it pertains to ineffective assistance for failure to advise a defendant about the possibility of consecutive sentences upon entering a guilty plea. Beam did not plead guilty in the instant case.

19

have been raised on direct appeal by Attorney Sponseller. *See Commonwealth v. Hickman*, 799 A.2d 136, 140 (Pa. Super. 2002) ("[a]ppellant's ineffectiveness of plea counsel claim is technically waived for failure to raise it in a direct appeal.").

**B. Claims of Violations of the Constitution of Pennsylvania or the Constitution or Laws of the United States**

Also among the statutory factors from which a conviction or sentence may have resulted creating an entitlement to post-conviction relief is a violation of the Constitution of this Commonwealth or the Constitution or laws of the United States. 42 Pa. C.S. §9543(a)(2)(i). Such a violation must have "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Id.*

First, Beam argues that the Police did not record his March 18, 2009 interrogation in violation of Pa. R.C.P. 573. This claim is without merit as police are not required to record interrogations. Our Superior Court has determined that "custodial interrogations do not need to be recorded to satisfy the due process requirements of the Pennsylvania Constitution." *Commonwealth v. Craft*, 669 A.2d 394, 397 (Pa. Super. 1995); *see also Commonwealth v. Harrell*, 65 A.3d 420, 429 (Pa. Super. 2013).

Second, Beam argues repeatedly[18] that the Commonwealth committed a *Brady* violation when evidence of the fetus was destroyed; arguing that had the Commonwealth obtained the DNA of the fetus it "very well could have proven the defendant was innocent and the victim was fabricating her confession." (PCRA Petition, 6/7/2013, at 22). Beam is not entitled to relief on this issue as it has been previously litigated. As noted above, to be eligible for relief under the PCRA, the issues raised by Beam must fall under circumstance enumerated in 42 Pa. C.S. §

---

[18] Beam makes several averments throughout his PCRA Petition premised on the Commonwealth's failure to secure the fetus and/or obtain DNA or physical evidence.

20

9543(a)(2) and not have been previously litigated or waived. 42 Pa. C.S. § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa. C.S. § 9544(a)(2). On appeal, Attorney Sponseller argued that Beam's "due process rights were violated by the Commonwealth's destruction of evidence through its failure to preserve the fetus' DNA to allow [Beam] to test the same and determine its exculpatory nature before the Superior Court." (*See* Superior Court Memorandum filed November 8, 2012 at 5). The Superior Court rejected this argument and affirmed the judgment of sentence in a thoroughly reasoned memorandum. *Id.*; *See also Commonwealth v. Bond*, 630 A.2d 1281, 1282 (Pa. Super. 1993) (claims that were previously "discussed thoroughly" by the Superior Court in a memorandum affirming Beam's judgment of sentence have been finally litigated and not subject to further review in post-conviction proceedings). As such, Beam is not entitled to further review of the issue in his PCRA petition.

Third, Beam argues that the Commonwealth did not produce his health records relating to the time of the crime or records regarding his mental state during the interrogation which his asserts are required pursuant to "the Federal Rule of the ABA Standards" if the prosecution intends to use them at trial or if they are material to the defense. (*See* PCRA Petition, 6/7/2013, at 21-22). Beam's claims fail as he has not cited any meaningful or relevant authority in support.

Fourth, Beam argues that police pressured him to incriminate himself during his interrogations in violation of his Fifth Amendment rights.[19] Overall, Beam argues that the incriminating statements he made to police[20] were a product of unlawful interrogation methods

---

[19] Beam does not seek recourse pursuant to his rights under the Pennsylvania Constitution.
[20] Presumably before and after Beam waived his *Miranda* rights.

21

because the police interrogated him from 9 a.m. to 6 p.m. (or nine hours) while he was in pain without food, water, or contact with his family.

Upon examination of the record, Beam's assertions are baseless. Beam, Valerie D., and M.D. arrived at the police station at approximately 9:00 a.m. on March 18, 2009. Trooper Pattillo testified that he took Valarie D., M.D., and Beam to be interviewed. (N.T., 8/1/2011, at 5-7; N.T., 8/2/2011, at 6). Initially, Trooper Pattillo directed questions to Valerie D., inquiring about general background information. (N.T., 8/2/2011, at 6). Then Trooper Pattillo gathered similar background information from Beam. *Id.* Valerie D. explained that M.D. was pregnant and that she was told M.D. was raped on a hunting trip. *Id.* As the interview progressed, Trooper Pattillo asked Beam to leave the room because M.D. was having difficulty disclosing information of a sexual nature. *Id.* at 7. M.D. then made a written statement about the rape on the hunting trip at approximately 10:40 a.m.[21] *Id.* at 7-8. Trooper Pattillo also re-interviewed Beam, and his story matched M.D.'s description of the rape. *Id.* At some point, Trooper Pattillo informed his supervisors that additional interviews needed to be conducted. *Id.* at 8. Thereafter, Trooper Peck interviewed Beam. *Id.* at 9.

Trooper Peck testified that during his interview, Beam confessed to having sex with M.D. at which point he was *Mirandized* and asked to give a written statement. *Id.* at 126. Beam complied and made a written statement at 12:20 p.m. *Id.* at 127. Trooper Peck testified that his interview with Beam, including the writing of the statement, lasted no more than an hour. *Id.* at 131. This testimony is supported by the fact that Beam's written statement was made at 12:20 p.m. After Beam gave his written statement, he was permitted to talk to Valarie. *Id.* at 131. He was subsequently arrested. (N.T., 8/2/2011, at 11).

---

[21] M.D. subsequently made two more written statements at approximately 11:15 a.m. and 11:30 a.m. (N.T., 8/2/2011, at 18).

22

Examining Beam's relative health, Trooper Peck testified that he did not recall Beam having heart problems. *Id.* at 134. Beam did indicate that he was not feeling well, but after he told the truth "he said he felt a lot better, and [Troper Peck] didn't see any indications of him being sick or ill after that time." *Id.* at 134-135. Tooper Peck also testified that Beam never requested medical attention or indicated that he had a failing pacemaker. *Id.* The only thing Beam indicated was that he had a stroke the week prior which he didn't seek medical attention for. *Id.* at 135.

The testimonies of Trooper Peck and Pattillo contradict Beam's assertions that he was interrogated from 9 a.m. to 6 p.m. while he was in pain without food, water, or contact with his family. Instead, the record supports the conclusion that he was interviewed (initially as a witness) by police officers from approximately 9:00 a.m. to a little after 12:20 p.m. after which he was allowed to speak to Valarie. Beam's assertions that police used unlawful interrogation methods are meritless as they lack credible factual support.

Next, specifically examining the statement's Beam made before he was *Mirandized*,[22] police are required to read a suspect his *Miranda* warnings when he is in custody and subject to interrogation. "The prosecution may not use statements stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of his right against self-incrimination and his right to counsel." *Commonwealth v. Gaul*, 912 A.2d 252, 255 (Pa. 2006). In other words, "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* (citing *Rhode Island v. Innis*, 446 U.S. 291 (1980)). "Before an individual is subjected to a custodial interrogation, he must make a knowing and intelligent waiver of his privilege against self-incrimination and right to counsel after adequate warning as to those rights." *Commonwealth v. Johnson*, 727 A.2d 1089, 1100 (Pa.

---

[22] *Miranda v. Arizona*, 384 U.S. 436 (1966).

1999). A court must examine the totality of the circumstances when determining whether *Miranda* warnings are necessary. *Id.*

The question thus becomes whether Beam was in custody and whether the encounter rose to the level of an interrogation. An individual is in custody for *Miranda* purposes when he "is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." *Johnson*, 727 A.2d at 1100. "The U.S. Supreme Court has elaborated that, in determining whether an individual was in custody, the 'ultimate inquiry is ... whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" *Commonwealth v. Boczkowski*, 846 A.2d 75, 90 (Pa. 2004) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)). The question of custody is objective and we must focus on the totality of the circumstances. *Boczkowski*, 846 A.2d at 90.

Undoubtedly, Beam made incriminating statements to the police before being read his *Miranda* rights. However, upon examination of the circumstances surrounding the statements, it is clear that Beam was not in custody, and therefore not subject to custodial interrogation. Beam freely arrived at the police station with Valerie D. and M.D. and he was initially questioned by Trooper Pattillo at two different times. First, in the presence of Valerie D. and M.D. to gather general background information, and second to determine if his version of the rape on the hunting trip matched M.D.'s story. He was then questioned by Trooper Peck (for the initial 20 to 25 minutes) as a witness to the crime, not as the perpetrator. (N.T., 8/1/2011, at 135). At no point was Beam formally arrested, nor was there any evidence presented to indicate that his freedom of movement was restricted. Trooper Peck testified that he and the other Trooper who

24

conducted the interview were not blocking Beam's way out of the door or restraining him in any way. (N.T., 8/1/2011, at 133)

*Commonwealth v. Foster* is similar to the instant case. In *Foster*, the police wanted to question the defendant as a "potential witness." *Commonwealth v. Foster*, 624 A.2d 144, 148 (Pa. Super. 1993). The defendant agreed to go to the police station to make a statement, and the police physically transported the defendant to the station but did not put him under arrest or deprive him of his freedom in any way. *Id.* "When they arrived at the police station, [defendant] and Detective Fegan went to an interview room where the pair spoke alone for approximately one hour and forty-five minutes." *Id.* The court reasoned that this manner of questioning did not constitute a "coercive atmosphere." *Id.* As such, the court concluded that the defendant was not subject to a custodial interrogation. *Id.*

Similarly, Beam was not undergoing a custodial interrogation when he made incriminating statements before he was read his *Miranda* rights; therefore, such statements were admissible. Beam's claim that his pre-*Miranda* statements should have been suppressed is without merit.

Beam also argues that the police obtained his post-*Miranda* confession unlawfully and it should have been suppressed. Specifically, that Trooper Peck told Beam to add to his confession that the word "it" meant "sex," which was a lie. Preliminarily, Beam's factual contention is unsupported by the record. Trooper Peck testified at trial that Beam waived his *Miranda* rights and then made a written statement. (N.T., 8/1/2011, at 127-128). Trooper Peck read the statement which included the phrase, "and *it* happened three times." *Id.* at 128 (emphasis added). Trooper Peck wanted to clarify what the word "it" meant, so Beam then wrote "it means sex." *Id.* Trooper Peck testified on cross-examination that he "asked [Beam] what *it* was that he

25

had written previously in the statement. He said *it* means sex. I said can you write that down? So he wrote it." *Id.* at 138 (emphasis added). Referring to his written statement, Beam then answered "yes" to the following questions: "is the information contained in this two page statement true and correct to the best of your knowledge and belief," "was this statement given of your own free will and accord without any promises or threats," and "do you understand what we're talking about in this statement?" *Id.* at 129.

Examining the record, there is no evidence to suggest that Trooper Peck fabricated Beam's oral statement that "it means sex," or forced him to write it down when it was not true. Trooper Peck simply sought clarification of Beam's written statement so as to avoid confusion. The record shows that Beam freely offered this clarification, willingly wrote it down, and then agreed that his statement as a whole was true and correct and given of his own free will.

Although Beam's factual contention lacks outright support, we will nonetheless examine the legality of his written confession pursuant to Fifth Amendment's protection against self-incrimination.[23] "When deciding . . . to suppress a confession, the touchstone inquiry is whether the confession was voluntary," which is determined by examining the totality of the circumstances. *Commonwealth v. Nester*, 709 A.2d 879, 882 (Pa. 1998) (citations omitted). "The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess." *Id.*

> When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

---

[23] As noted above, Beam does not seek recourse pursuant to the Pennsylvania Constitution.

26

*Id.* As discussed in detail above, viewing the totality of the circumstances, Beam's interrogation was anything but manipulative or coercive. His interview with Trooper Peck lasted no longer than an hour, he freely arrived at the police station to answer questions as a witness, and his movements were not restrained or controlled in any way. Based on testimony, Trooper Peck's attitude was reasonable, especially considering he began the interview with the understanding that Beam was a witness. Examining Beam's physical and psychological state, Beam argues that his confession was involuntary due to the physical pain he was in. The Court disagrees. Beam did indicate that he was not feeling well, but after he told the truth "he said he felt a lot better, and [Troper Peck] didn't see any indications of him being sick or ill after that time." *Id.* at 134-135. Furthermore, Trooper Peck testified that Beam's sick feelings "directly coincided with the time [he] started asking him if he had sex with [M.D.]." *Id.* at 134. Beam never requested medical attention during the interview or indicated that he had a failing pacemaker. *Id.* Additionally, Trooper Peck did not recall Beam having any heart problems. (N.T., 8/1/2011, at 134). The only thing Beam told the Troopers was that he had a stroke the week prior which he didn't seek medical attention for. *Id.* at 135. This evidence simply does not support a finding that Beam was in such a compromised physical state that he was deprived of his ability to make a free and unconstrained decision to confess. To the contrary, the evidence suggests that Beam's ill feelings were caused by his own guilt and the internal conflict between his self-preservation and his desire tell the truth. Upon examination of the totality of the circumstances, the Court finds that Beam's confession was voluntary and his arguments to the contrary are meritless.

Finally, Beam argues that he received a sentence greater than the lawful maximum. This claim is without merit as the sentences relating to each count are within the standard ranges promulgated by the Pennsylvania Commission on Sentencing.

27

## CONCLUSION

This Court's review of the record and survey of the law reveals that Beam has made no meritorious claims for relief under the PCRA. As such, the instant petition for post-conviction collateral relief is dismissed without a hearing.

# IN THE COURT OF COMMON PLEAS
## OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA
### FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| Commonwealth of Pennsylvania, | : | Criminal Action |
| | : | |
| | : | No. 499-2009 |
| vs. | : | |
| | : | |
| | : | |
| Kevin Lee Beam, | : | *Post Conviction Relief Act* |
| Defendant | : | Honorable Carol L. Van Horn |

## OPINION *sur* PA. R.A.P. 1925(a) AND ORDER OF COURT

Before Van Horn, J.

OCT 0 6 2014

1

/33

IN THE COURT OF COMMON PLEAS
OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA
FRANKLIN COUNTY BRANCH

| Commonwealth of Pennsylvania, | : | Criminal Action |
| | : | |
| | : | No. 499-2009 |
| vs. | : | |
| | : | |
| | : | |
| Kevin Lee Beam, | : | *Post Conviction Relief Act* |
| Defendant | : | Honorable Carol L. Van Horn |

## STATEMENT OF CASE

The Court has comprehensively set forth the factual and procedural history of the above captioned matter in its Opinion and Order of Court disposing of the Defendant's Petition for Post-Conviction Relief. *See* attached Opinion and Order, July 30, 2014. Thus, we will not again explain the case leading to the instant appeal, but instead incorporate such statement herein by reference.

Following this Court's July 30, 2014 Opinion and Order, Defendant filed a Notice of Appeal on August 28, 2014. That same day this Court issued an Order requiring Defendant to file a Concise Statement of Matters Complained of on Appeal within twenty-one (21) days. Defendant filed his Concise Statement of Matters Complained of on Appeal on September 18, 2014. The issue is now ripe for decision in this Opinion and Order of Court.

Many of the issues raised by Defendant have been previously litigated and addressed by this Court or the Superior Court in Defendant's direct appeal or in our Order and Opinion denying Defendant's PCRA petition. However, in this 1925 Opinion, it is beneficial to provide the Superior Court with a comprehensive and inclusive understanding of each issue raised.

2

Therefore, we incorporate by reference all of the prior Opinions but still address each issue in full.

## ISSUES RAISED

Defendant raises the following issues in his Concise Statement[1]

1. Defendant asserts his actual innocence and a manifest injustice has resulted in his wrongful conviction.
2. Defendant was denied due process of law when pretrial and trial counsel failed to request forensic DNA testing.
3. Defendant was denied due process and Fifth Amendment protection against self-incrimination when trial counsel failed to object to inadmissible statements and when appellate counsel failed to raise such a claim on appellate review.
4. Defendant was denied due process when trial counsel failed to properly investigate and prepare for trial.
5. Defendant was denied due process when Defendant received a sentence greater than what he was led to believe and it was not explained to Defendant the maximum allowable sentence to be imposed and that the sentences could be run consecutively.
6. Defendant was denied due process when trial counsel failed to present exculpatory and impeachment evidence.
7. Defendant was denied due process when trial counsel failed to make timely objection to the introduction of prejudicial and inadmissible evidence.
8. Defendant was denied due process when appellate counsel failed to raise meritorious claims of error on appeal and file a petition for allowance of appeal to the Pennsylvania Supreme Court during direct appellate review.
9. Defendant was denied due process when PCRA counsel failed to investigate, recognize and present meritorious claims presented for review.
10. Defendant was denied due process when the reviewing PCRA court denied Defendant's request for Post-Conviction Collateral Relief.

## STANDARD OF REVIEW

Our appellate courts review an order dismissing a petition filed under the PCRA to determine whether the decision of the PCRA court "is supported by evidence of record and is free of legal error." *Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010) (citation omitted). The scope of review is limited: the reviewing court must view the findings of the PCRA court and the evidence of record in the light "most favorable to the prevailing party at the trial level." *Id.* The decision of the PCRA court may be affirmed "on any grounds if it is

---

[1] Statement of Matters Complained of on Appeal, 9/18/2014.

3

supported by the record." *Id.* In the case of a purely legal question, the standard of review is *de novo*, and the scope of review is plenary. *See Commonwealth v. Patton*, 985 A.2d 1283, 1286 (Pa. 2009).

The assistance of counsel is presumed effective, and the PCRA defendant has the burden to demonstrate otherwise by a preponderance of the evidence. *See Commonwealth v. Pierce*, 786 A.2d 203, 212 (Pa. 2001). Often referred to as the *Pierce* test, a showing of ineffective assistance is made where a defendant proves: 1) the underlying substantive claim has arguable merit, 2) there was no reasonable basis for counsel's actions or failure to act, and 3) prejudice was suffered as a result of such deficient performance. *Id.* at 213. It has been repeatedly held that "trial counsel will not be deemed ineffective for failing to pursue a meritless claim." *Commonwealth v. Rega*, 933 A.2d 997, 1019 (Pa. 2007).

## DISCUSSION

For purposes of clarity, we begin by addressing Defendant's second error complained of on appeal. Defendant argues he was denied due process of law when pretrial and trial counsel failed to request forensic DNA testing. Although not specifically referenced in Defendant's Concise Statement of Matters Complained of on Appeal, we assume Defendant is referring to DNA testing of the destroyed fetus in question. Throughout Defendant's PCRA Petition he makes several arguments premised on the Commonwealth's alleged failure to secure the fetus and/or obtain DNA or physical evidence. As noted in our July 30, 2014 Order and Opinion, the Superior Court rejected these various arguments in Defendant's direct appeal and as such a PCRA claim against the Commonwealth on this issue has been "previously litigated."[2] Wholly absent from Defendant's PCRA Petition is any allegation that pretrial or trial counsel was ineffective for "failing to request forensic DNA testing." A claim of error is deemed to be

---

[2] 42 Pa.C.S. § 9544.

4

waived if the defendant could have raised the issue at trial, on appeal, or in a prior post conviction proceeding but failed to do so. 42 Pa.C.S. § 9544(b). In this case Defendant's PCRA Petition is devoid of any allegations of ineffective assistance of counsel by pretrial/trial counsel and any specific facts that would even infer such a claim. Thus, Defendant's PCRA Petition should have contained sufficient facts to sustain an allegation for this type of ineffectiveness claim that would properly satisfy the three prongs of the *Pierce* test.

The likely reason for the absence of these facts in Defendant's PCRA petition is that they are simply contrary to the record. The victim's abortion in which the fetus was ultimately terminated occurred on March 21, 2009. Trial counsel, Annie Gómez, took on Defendant's case in July of 2011, approximately one month prior to Defendant's trial. Thus, the ability of Attorney Gómez to request forensic DNA testing of the fetus had long since passed. Further, there were no facts alleged in Defendant's PCRA petition which indicated that pretrial counsel, Attorney Michael Toms[3], even had an opportunity to request forensic DNA testing before the abortion occurred. Defendant was originally charged on March 18, 2009. On March 19, 2009 he filed a Motion for Indigent's Rights to Adequate Defense. Attorney Toms was then appointed to represent the Defendant. Just two days later, the victim's abortion was performed, ultimately destroying the forensic DNA in question. Given this timeline, we find it very likely that Attorney Toms had yet to even meet with the Defendant or be informed of the pending abortion, let alone have ample time to file a motion to request forensic DNA testing. Therefore, Attorney Toms could not have been ineffective for failing to request forensic DNA testing. Thus, for the aforementioned reasons, Defendant's assertion on this issue is meritless.

---

[3] The Law Offices of James Reed was also subsequently court appointed as pretrial counsel but this was well after the victim's abortion occurred and forensic DNA could have been recovered.

5

In his third assignment of error, Defendant alleges he was denied due process and his Fifth Amendment right against self-incrimination based on his trial counsel's alleged failure to object to inadmissible statements and appellate counsel's failure to raise this claim on appellate review. Defendant thus appears to structure this error as a layered ineffective assistance of counsel claim. The Pennsylvania Supreme Court has established the criteria for a layered ineffective assistance counsel claim stating:

> [A] petitioner must plead in his PCRA petition that his prior counsel, whose alleged ineffectiveness is at issue, was ineffective for failing to raise the claim that the counsel who preceded him was ineffective in taking or omitting some action. In addition, a petitioner must present argument ... on the three prongs of the *Pierce* test as to each relevant layer of representation.

*See Commonwealth v. McGill*, 832 A.2d 1014, 1023 (Pa. 2003).

As such, in order to prove that appellate counsel was ineffective, Defendant must first prove that trial counsel was ineffective by satisfying the *Pierce* test. In this case Defendant states generally that "trial counsel failed to object to inadmissible statements." (*See* Def.'s Concise Statement p. 1). Presumably, these inadmissible statements are a reference to Defendant's argument that police pressured him to incriminate himself during his interview in violation of his Fifth Amendment rights[4]. We addressed this specific argument in our July 30, 2014 Order and Opinion finding:

> The testimonies of Trooper Peck and Pattillo contradict Beam's assertions that he was interrogated from 9 a.m. to 6 p.m. while he was in pain without food, water, or contact with is family. Instead the record supports the conclusion that he was interviewed (initially as a witness) by police officers from approximately 9:00 a.m. to a little after 12:20 p.m. after which he was allowed to speak to Valarie. Beam's assertions that police used unlawful

---

[4] Specifically, Defendant argues that the incriminating statements he made to police were a product of unlawful interrogation methods because he was interrogated from 9 a.m. to 6 p.m. (nine hours) while he was without food, water or contact with his family.

6

interrogation methods are meritless as they lack credible factual support.

*See id.* at p. 23. We also analyzed Defendant's argument that he was not properly *Mirandized* before he issued incriminating statements, finding "[s]imilarly, [Defendant] was not undergoing a custodial interrogation when he made incriminating statements before he was read his Miranda rights; therefore, such statements were admissible." In regards to Defendant's assertion that his written confession was involuntary, we also found this argument to be meritless, concluding that "the evidence suggests that [Defendant's] ill feeling were caused by his own guilt and the internal conflict between his self-preservation and is desire to tell the truth." *See* Opinion and Order p. 27. July 30, 2014. Further, when reviewing all of the facts available in the record, we concluded that Trooper Peck's interview of the Defendant could hardly be considered "manipulative or coercive." *Id.* at 27.

Therefore, Defendant has failed to properly argue a layered ineffective assistance of counsel claim on this issue because he cannot establish even the first prong of the *Pierce* test for his trial counsel. In satisfying an ineffective assistance of counsel claim, the first prong of the *Pierce* test requires the Defendant to show that his underlying substantive claim has arguable merit. *Pierce*, 786 A.2d at 212. For the above mentioned reasons, Defendant's assertion that the incriminating statements he gave were inadmissible is clearly without arguable merit. Therefore, trial counsel was not ineffective for failing to object to these alleged "inadmissible statements" and appellate counsel cannot be ineffective for failing to raise such a meritless claim on appellate review.

In Defendant's fourth and sixth matters complained of on appeal, he argues he was denied due process when trial counsel failed to properly investigate and prepare for trial and present exculpatory and impeachment evidence. Defendant made a similar accusation in his

7

initial PCRA petition against pretrial counsel, Attorney Toms. As with Attorney Toms, Defendant again fails to show actual prejudice and does not meet the third prong of the *Pierce* test. Defendant has not identified any exculpatory evidence Attorney Gómez failed to "go after" and does not explain Attorney Gómez's alleged failure to investigate. Therefore, similar to Attorney Toms, Defendant has failed entirely to prove that because of Attorney Gómez's alleged errors, there is a reasonable probability that the outcome of the proceedings would have been different.

Additionally, we find Defendant's argument that Attorney Gómez failed to properly prepare for trial to also be meritless. Defendant asserted in his PCRA petition that the fact Attorney Gómez had only a month to prepare for trial amounted to ineffective assistance of counsel. This Court rejected such an argument, finding that Attorney Gómez filed a motion to dismiss before trial alleging that the Commonwealth committed a *Brady* violation and finding that the record indicated Attorney Gómez performed at trial in an adequately prepared manner. Therefore, Defendant cannot satisfy the *Pierce* test, as his claim lacks arguable merit.

Finally, this Court noted at length in our July 30, 2014 Order and Opinion, that Attorney Gómez introduced various types of impeachment evidence. Specifically, Attorney Gómez attacked the victim's credibility and cross-examined her on her prior inconsistent statements.[5] *See id* at 13-15. Defendant has failed to identify any other impeachment evidence that was not offered by Attorney Gómez. As such, this Court finds that Defendant has again failed to satisfy the first prong of the *Pierce* test, as this claim has no arguable merit, and therefore this assertion is meritless.

In Defendant's fifth matter complained of on appeal, he argues that he was denied due process when he received a sentence greater than what he was lead to believe, that it was not

---

[5] This Court provided numerous specific examples of this in our July 30, Opinion and Order on pages 13-15.

8

explained to him the maximum allowable sentence to be imposed, and that the sentences could be run consecutively. Specifically, Defendant asserts that Attorney Gómez and Attorney Sponseller were ineffective for failing to explain to him that his charges could run consecutively which "caused prejudice by all of the attorney's inaction." (*See* Def.'s PCRA Pet. p. 18 June 7, 2014). As outlined in our prior Order and Opinion, Defendant clearly fails the third prong of *Pierce* as he has not shown actual prejudice because he has failed to show that there was a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different. *See Commonwealth v. Johnson*, 966 A.2d 523, 533 (Pa. 2009). As this Court has previously outlined, "[defendant] has not shown or even alleged how his attorneys' failure to inform him of the possibility of consecutive sentences would have altered or changed Judge Walsh's sentencing scheme." *See* Opinion and Order, p. 19 July 30, 2014). Finally, Defendant's reference to *Commonwealth v. Diehl*, 61 A.3d 265, 266 (Pa. Super 2013), is not applicable to the case here as it concerns the failure to advise a defendant about the possibility of consecutive sentences upon entering a plea. In this case, the Defendant did not plead guilty but instead was convicted in a jury trial.

In Defendant's seventh matter complained of on appeal he claims that trial counsel failed to make timely objection to the introduction of prejudicial and inadmissible evidence. Once again Defendant fails to identify exactly what prejudicial and inadmissible evidence he is referring to.[6] This general language, coupled with the disorganized nature of Defendant's Pro se Petition, makes it difficult to identify what specific prejudicial and inadmissible evidence Defendant is referring to. "When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review." *Commonwealth v. Thompson*, 778 A.2d 1215, 1223 (Pa. Super. 2001). "When an appellant fails adequately to identify in a concise manner the issues

---

[6] This Court has already addressed the alleged inadmissible statements contained in Defendant's third error.

9

sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues." *In re Estate of Daubert*, 757 A.2d 962, 963 (Pa. Super. 2000). The Superior Court has found that when an issue is not specific enough for a trial court to address, the issue is waived. *Thompson*, 778 A.2d at 1224. Because this Court cannot ascertain exactly what evidence Defendant is asserting was prejudicial or inadmissible and that trial counsel failed to make a timely objection to, we cannot address this issue and find it to be waived. Additionally, without specific facts identifying the alleged inadmissible evidence, Defendant would clearly be unable to satisfy the standard for ineffective assistance of counsel under the *Pierce* test.

In Defendant's eighth matter complained of on appeal he alleges he was denied due process when appellate counsel failed to raise meritorious claims of error on appeal and file a Petition for Allowance of Appeal to the Pennsylvania Supreme Court. We find this assertion meritless. First, Defendant's appellate counsel, Attorney Sponseller, did raise claims of error on appeal he believed were meritorious. In fact, Attorney Sponseller raised three issues but each issue was ultimately determined to be meritless by the Superior Court in Defendant's direct appeal.[7] Defendant argues specifically that Attorney Sponseller "pulled documents out of the appeal" pertaining to various issues.[8] As we explained in our prior Opinion and Order, there was no proof of this conduct and merely stating that there is something wrong with what counsel did, such as that his action violated the constitution, fail to meet the requirements of an

---

[7] The three issues raised for review by the Superior Court were: (1) Whether the Appellant's due process rights were violated by the Commonwealth's destruction of evidence through its failure to preserve the fetus' DNA to allow the Appellant to test the same and determine its exculpatory nature (2) Whether the trial court's decision to grant the Commonwealth's motion *in limine* and exclude evidence of the Appellant's 71 IQ was an abuse of discretion (3) Whether the jury's verdict was against the weight of the evidence and as a result, the trial court's denial of a new trial was an abuse of discretion. *Commonwealth v. Beam* 453 MDA 2012 (Pa. Super. 2012).
[8] These issues pertained to the destruction of the fetus, how Defendant was coached into giving a confession, how his *Miranda* Rights were violated during interrogation, and how the interrogation was not audio or video recorded.

10

ineffectiveness claim. Additionally, many of these "pulled out issues" have already been found meritless by this Court, such as how the Defendant's *Miranda* rights were allegedly violated.

Defendant also alleges that he was denied due process because Attorney Sponseller failed to file a Petition for Allowance of Appeal to the Pennsylvania Supreme Court during direct appellate review. In *Commonwealth v. Hernandez*, 755 A.2d 1 (Pa. Super. 2000), the Superior Court held that "where there is an unjustified failure to file a requested direct appeal, the conduct of counsel falls beneath the range of competence demanded of attorneys in criminal cases, denies the accused the assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution, as well as the right to direct appeal under Article V, Section 9, and constitutes prejudice for purposes of Section 9543(a)(2)(ii)." In these circumstances and "where the remaining requirements of the PCRA are satisfied, the petitioner is not required to establish his innocence or demonstrate the merits of the issue or issues which would have been raised on appeal." *Commonwealth v. Lantzy*, 736 A.2d 564, 572 (Pa. 1999). Such an inquiry into the merits of the issues is unnecessary because "the failure to perfect a requested appeal is the functional equivalent of having no representation at all." *Id.* at 571. As such, a failure to file a requested appeal denies a fundamental right and constitutes prejudice *per se*. *Id.* ("[A]n appellant need not show that the petition would likely have been granted, but merely that the appeal was requested and counsel failed to act. In these situations, the Supreme Court has effectively held that the prejudice prong of the test for ineffective assistance has been established.") "Clearly, if a request to file a direct appeal is necessary to sustain an ineffectiveness claim based upon the failure to file a direct appeal, then such a request is also necessary where the alleged ineffectiveness is the failure to file a petition for allowance of appeal." *Commonwealth v. Bath*, 907 A.2d 619, 622 (Pa. Super. 2006).

11

In the instant case, appellate counsel cannot be considered *per se* ineffective as the Defendant has failed to provide any evidence that he requested an Allowance of Appeal to the Supreme Court. The Defendant's original and amended petitions contain no facts which indicate that he ever requested Attorney Sponseller to file a Petition for Allowance of Appeal to the Pennsylvania Supreme Court during direct appellate review. As such, Defendant has failed to prove *per se* ineffectiveness as Attorney Sponseller cannot be faulted for failing to take an action never requested by the Defendant.

However, the ineffectiveness inquiry does not end there, and "[w]here a defendant does not ask his attorney to file a direct appeal, counsel still may be held ineffective if he does not consult with his client about the client's appellate rights." *Commonwealth v. Markowitz*, 32 A.3d 706, 714 (Pa. Super. 2011). This standard imposes a duty on counsel to adequately consult with the defendant as to the advantages and disadvantages of an appeal where there is reason to think that a defendant would want to appeal. *See Roe v. Flores-Ortega* 528 U.S. 470 (2000); *see also Commonwealth v. Touw*, 781 A.2d 1250 (Pa. Super. 2001). Yet, the assistance of counsel is presumed effective and to show ineffectiveness a Defendant has burden of satisfying the *Pierce* test. Specifically, *Roe* and *Touw* impose a constitutional duty of appellate counsel to adequately consult with the defendant as to advantages and disadvantages of an appeal only when "(1) . . .a rational defendant would want to appeal (for example, because there are non-frivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Touw*, 781 A.2d at 1254 (quoting *Roe*, 528 U.S. at 480). Because we have already discussed how Defendant failed to demonstrate to counsel his interest in an Allowance of Appeal, we address only the former condition. We find the case in question

12

analogous with the Superior Court's decision in *Bath*. While addressing the same issue before this Court, the *Bath* Court stated:

> Bath never suggests which of his issues on direct appeal would not be considered frivolous upon further appeal. We find that Bath has failed to meet the prejudice prong of the test for ineffective assistance of counsel because Bath never puts forward or describes an issue raised upon direct appeal that would rise above mere frivolity upon further review. More importantly, we find that Bath did, in fact, have to meet this burden.

*Bath*, 907 A.2d at 623. Similar to *Bath*, the Defendant in the instant case has failed to suggest which of his issues on direct appeal would not be considered frivolous upon further appeal. As such, the Defendant has failed to meet the prejudice prong of the *Pierce* test as he has not shown that any issue raised upon direct appeal would "rise above mere frivolity upon further review." *Id.* Therefore his claim lacks arguable merit. Finally, because the burden to show this on the Defendant, we find Defendant's assertion on this issue meritless.

In his ninth matter complained of on appeal, Defendant argues that he was denied due process and equal protection when PCRA counsel failed to investigate, recognize and present meritorious claims for review. In this Court's January 29, 2014 Order, Attorney Mark F. Bayley was appointed to represent the Defendant in the proceeding PCRA matters. Attorney Bayley filed a Motion by Court-Appointed Counsel to Withdraw after concluding Defendant's PCRA Petition had no merit on May 6, 2014. Attorney Bayless provided a detailed No Merit Letter pursuant to *Turner* and *Finley*. The No Merit Letter was submitted after sufficient investigation of the facts and law relevant to the case. After carefully analyzing the various issues raised in Defendant's Petition, Attorney Bayley ultimately found that none contained merit. This Court agreed and on May 12, 2014, granted Attorney Bayley's Motion to Withdraw as counsel.

13

Therefore, Defendant's assertion that PCRA counsel failed to investigate, recognize, and present meritorious claims is clearly without merit. Attorney Bayley conducted sufficient investigation as indicated throughout his No Merit Letter. Simply because there were no meritorious claims to recognize and present does not mean Defendant was denied due process and equal protection. Therefore, we find Defendant's argument on this issue meritless.

Finally we address Defendant's first and tenth matters complained of on appeal. In his first matter complained of on appeal, Defendant generally reasserts his actual innocence and states that a manifest injustice has resulted from a wrongful conviction. However, Defendant provides no legal theories upon which relief could be granted on this "issue" and as such the Court finds no further need to address it. In his final matter complained of Defendant claims he was denied due process when this Court denied his request for Post Conviction Collateral Relief. This Court detailed its reasoning for denying Defendant PCRA relief in our July 30, 2014 Opinion and Order. Based on this and this Court's authority to dismiss Defendant's PCRA Petition, we find Defendant's final argument without merit.

## CONCLUSION

Pursuant to the Opinion and Order dated July 30, 2014, the Court explained the analysis involved in our determination that the allegations in Defendant's PCRA Petition lack arguable merit. Therefore, the Court respectfully requests the appeal be dismissed, and the Superior Court affirm our prior decision denying relief under the PCRA.

14